# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                   No. CR 19-1989 JB

ROBERT ALDERETE,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion to Suppress Evidence, filed November 5, 2019 (Doc. 21)("Motion"). The Court held an evidentiary hearing on February 3, 2020. See Clerk's Minutes at 1, filed February 3, 2020 (Doc. 41). The primary issues are: (i) whether the Albuquerque Police Department ("APD") officer who opened the driver's seat door of Defendant Robert Alderete's vehicle to obtain the vehicle identification number ("VIN") when it was difficult to view the VIN on the vehicle's dashboard from outside the vehicle violated Alderete's rights under the Fourth Amendment to the Constitution of the United States of America; and (ii) whether the APD officers would have had probable cause to seek a search warrant for Alderete's vehicle if the APD officers had not conducted the VIN inspection and seen what appeared to be a firearm in Alderete's vehicle. The Court concludes: (i) the VIN inspection inside Alderete's vehicle did not violate Alderete's Fourth Amendment rights, because neither of the VIN's locations -- on the dashboard and on the driver's seat doorjamb -- is subject to a reasonable expectation of privacy; and (ii) the United States has not established a high level of confidence that, absent the VIN inspection, a warrant inevitably would have been issued and the firearm obtained, because impounding Alderete's vehicle was unlawful and the

APD officers may not have found the firearms had they not impounded the vehicle and waited to

obtain a search warrant.  Because the Court concludes that the VIN inspection was lawful, the

Court denies the Motion and will not suppress the evidence of the firearms.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its

essential findings on the record when deciding a motion that involves factual issues.  See Fed. R.

Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its

essential findings on the record.").  The findings of fact in this Memorandum Opinion and Order

shall serve as the Court's essential findings for purposes of rule 12(d).  The Court makes these

findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge

to decide preliminary questions relating to the admissibility of evidence, including the legality of

a search or seizure, and the voluntariness of an individual's confession or consent to search.  See

United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[ ] 104(a) . . . ,

the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'"

(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)).  In deciding such preliminary

questions, the other rules of evidence, except those with respect to privileges, do not bind the

Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether

a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not

bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in

ruling on a motion to suppress.  See United States v. Cook, 761 F. App'x 840, 846 n.12 (10th Cir.

2019)(unpublished)[1](noting that the Confrontation Clause of the Sixth Amendment to the

---

[1]United States v. Cook is an unpublished opinion, but the Court can rely on an unpublished
opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R.

Constitution does not apply to sentencing hearings and that the defendant "does not direct us to any opinion from our court holding that the Confrontation Clause applies to suppression hearings"); United States v. Merritt, 695 F.2d at 1269;  United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("We need not resolve whether Crawford [v. Washington, 541 U.S. 36 (2004)[2]]'s protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'"); United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant.  The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings.").  Cf. United States v.

---

32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The United States Court of Appeals for the Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266 (10th Cir. 2005).  The Court finds that United States v. Cook, 761 F. App'x 840 (10th Cir. 2019); United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010); United States v. Garcia, 324 F. App'x 705 (10th Cir. 2009); United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009); United States v. Malady, 209 F. App'x 848 (10th Cir. 2006); and United States v. King, 209 F. App'x 760 (10th Cir. 2006), have persuasive value with respect to material issues and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]Crawford v. Washington stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross examine the witness.  See 541 U.S. at 53-54.

Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").[3]  Accordingly, the Court finds:

1.     On May 3, 2019, Albuquerque Police Department ("APD") police officers responded to a 911 call at a Family Dollar Store, located at 7226 Central Ave. SE, Albuquerque, New Mexico 87108.  Criminal Complaint at 1, filed June 11, 2019 (Doc. 1).  See Motion ¶ 1, at 1 (asserting this fact); United States' Response in Opposition to Defendant's Motion to Suppress Evidence at 2, filed December 2, 2019 (Doc. 33)("Response")(asserting this fact)[4]; State of New Mexico Uniform Incident Report at 1, filed December 2, 2019 (Doc. 33-2)("Incident Report").

2.     The caller reported that a male in a tan Infiniti car pointed a gun at the caller and his child.  See Motion ¶ 1, at 1 (asserting this fact); Response at 2 (asserting this fact); Incident Report at 2;  Affidavit of Victor J. Hernandez ¶¶ 6-7, at 2-3, filed June 11, 2019

---

[3]Alderete does not object under Crawford v. Washington to any evidence in this case; the Court, therefore, need not decide whether Crawford v. Washington applies to suppression hearings.  See United States v. Leora, 59 F. Supp. 3d 1089, 1096 n.3 (D.N.M. 2014).  The Court notes, however, that the courts that have decided whether the Confrontation Clause applies to suppression hearings have found that Crawford v. Washington does not apply to suppression hearings.  See Ebert v. Gaetz, 610 F.3d 404, 414 (7th Cir. 2010)(holding the right of confrontation does not apply at a suppression hearing); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings.  To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia.").  Cf. United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)("[W]e hold that Crawford v. Washington does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence."); United States v. Saneaux, 365 F. Supp. 2d 493, 498 n.5 (S.D.N.Y. 2005)(Haight, J.)(concluding that Crawford v. Washington does not apply to determining whether a statement is admissible under the co-conspirators hearsay exception, "because the Court is not bound by the Rules of Evidence in the disposition of preliminary matters").

[4]In the Response, the United States misreports the 911 call's date as May 2, 2019.  See Response at 2.  This date differs from the date of May 3, 2019, found on: (i) the Criminal Complaint at 1; (ii) the Incident Report at 1; and (iii) the Motion ¶ 1, at 1.

(Doc. 1)("Hernandez Aff.")[5]; Dispatch Recording at 1:20-1:30, filed November 5, 2019 (Doc. 21 Ex. A).

3.      The caller described the male as a bald, Hispanic, thirty-to-forty-year-old male, who was wearing a white shirt and a gold chain, and who had many tattoos.  See Motion ¶ 1, at 1 (asserting this fact); Response at 2 (asserting this fact); Incident Report at 2; Hernandez Aff. at ¶ 6, at 2; Dispatch Recording at 1:50-2:00.

4.      The 911 call occurred at 5:17 p.m., APD officer Nathaniel Carter was dispatched at 5:19:59 p.m., and he arrived at the scene at 5:29:36 p.m.  See Draft Transcript of Proceedings at 24:4-13 (held February 3, 2020)(Carter, Gagan)("Tr.").[6]

5.      The caller's name is Gregory Stephens.  See Motion ¶ 1, at 1 (asserting this fact); Incident Report at 2.

6.      APD Sergeant Amy Sedler, and APD police officers Carter and Adam Theroux, arrived at the Family Dollar Store in three separate vehicles.  See Response at 2 (asserting this fact).

7.      When the APD officers arrived at the Family Dollar Store, they located a tan Infiniti with a male in the driver's seat, but they could not locate the caller.  See Motion ¶¶ 2-3, at 1-2 (asserting this fact); Response at 2 (asserting this fact); Hernandez Aff. ¶¶ 8, 10, at 3; Incident Report at 2; Carter Lapel Video at 1:00-1:10 (dated May 3, 2019), filed November 5, 2019

---

[5]The Hernandez Aff. is pages 2 through 5 of the Criminal Complaint.

[6]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

(Doc. 21 Ex. B)[7]; Dispatch Recording at 3:50-4:05; Tr. at 7:14-15 (Carter); id. at 24:15-18 (Gagan, Carter).

8.      The Family Dollar Store employees "had not seen any kind of assault or altercation involving" the person in the Infiniti.  Tr. at 25:9-15 (Gagan, Carter).

9.      The Infiniti had a temporary New Mexico tag with the number 19T-153837.  See Motion ¶ 3, at 2 (asserting this fact); Incident Report at 2; Hernandez Aff. ¶ 8, at 3.

10.      The APD officers ran a check of the Infiniti's temporary tag, which indicated that the vehicle was registered to Defendant Robert Alderete.  See Hernandez Aff. ¶ 9, at 3; Response at 2 (asserting this fact); Motion ¶ 6, at 2 (asserting this fact).

11.      An APD officer ran a search of the temporary tag number "and learned that the registered owner of the vehicle had a warrant for his arrest."  Tr. at 7:16-18 (Carter).

12.      The APD officers also ran Alderete's name through police databases and confirmed that Alderete was wanted on a misdemeanor warrant.  See Response at 2 (asserting this fact); Hernandez Aff. ¶ 10, at 3; Incident Report at 2.

13.      For approximately ten minutes, the APD officers instructed the male in the Infiniti to exit the vehicle, using sirens, horns, and one of the police vehicle's public announcement ("PA") system.  Response at 2 (asserting this fact).  See Motion ¶ 7, at 2 (asserting this fact); Hernandez Aff. ¶ 10, at 3; Incident Report at 2; Carter Lapel Video at 2:45-13:15.

---

[7]The United States and Alderete refer to the Carter Lapel Video as "Lapel Video 1." Motion ¶ 4, at 2; Response at 2.  Because the lapel camera was on Carter's lapel, the Court will refer to the lapel video as Carter Lapel Video.  The Court has viewed the three lapel videos offered by Alderete as evidence, see Notice of Lodging of DVD at 1, filed November 5, 2019 (Doc. 22), and the Carter Lapel Video provides the best footage from which to make factual findings.

14.     The male in the Infiniti did not respond, <u>see</u> Response at 2 (asserting this fact), and one APD officer observed that the male inside the Infiniti was "not moving at all," Carter Lapel Video at 7:28-7:30.  <u>See</u> Motion ¶ 7, at 2 (asserting that an APD officer observed the male as being "asleep"); Response at 2 (asserting that the male appeared "passed out"); Incident Report at 2 (reporting that the male "appeared to be unconscious"); Tr. at 7:22-8:1 (Outler, Carter); <u>id.</u> at 26:12-23 (Gagan, Carter).

15.     The APD officers approached the Infiniti with their guns drawn to make a welfare check, <u>see</u> Carter Lapel Video at 16:10-16:20, opened the back passenger door, and woke the male in the vehicle, <u>see</u> Motion ¶ 7, at 2 (asserting this fact); Response at 2 (asserting this fact); Incident Report at 2; Carter Lapel Video at 17:20-17:50; Tr. at 8:22-9:1 (Carter, Outler); <u>id.</u> at 27:20-28:13 (Gagan, Carter).

16.     As the APD officers approached the vehicle, they observed two cellular telephones in the front passenger seat and two cellular telephones on the male's lap.  <u>See</u> Response at 2-3 (asserting this fact); Incident Report at 2; Tr. at 9:2-7 (Carter, Outler).

17.     Owning multiple cellular telephones is a possible sign of drug trafficking.  <u>See</u> Tr. at 9:11 (Carter).

18.     The male complied with the APD officers' orders, exited the Infiniti, and closed the driver's seat door.  <u>See</u> Motion ¶ 7, at 2 (asserting this fact); Response at 3 (asserting this fact); Incident Report at 2; Carter Lapel Video at 17:40-18:05; Tr. at 10:3-6 (Carter).

19.     After the male exited the Infiniti, he identified himself as Alderete.  <u>See</u> Motion ¶ 8, at 2 (asserting this fact); Response at 2 (asserting this fact); Incident Report at 2; Hernandez Aff. ¶ 10, at 3; Tr. at 11:5-6 (Carter).

20.     Alderete was wearing a black t-shirt.  See Motion ¶ 9, at 2 (asserting this fact); Carter Lapel Video at 18:30-18:40; Tr. at 30:16-31:2 (Gagan, Carter).

21.     The APD officers handcuffed Alderete and then patted his body.  See Response at 3 (asserting this fact); Carter Lapel Video at 18:05-19:15; Tr. at 11:4-8 (Carter); id. at 11:14-12:5 (Outler, Carter).

22.     At this point, the APD officers had not yet arrested Alderete.  See Tr. at 15:15-22 (Carter, Outler).

23.     The APD officers had not found the victim or any witnesses of the alleged assault when they detained Alderete.  See Tr. at 29:13-22 (Gagan, Carter).

24.     The APD officers asked Alderete for identification, and Alderete said his identification was in his pocket.  See Tr. at 11:7-9 (Carter).

25.     Alderete did not have any identification in his pocket, so Theroux asked Alderete if he could look for Alderete's ID in his wallet, which Theroux believed he could see in the vehicle's front seat.  See Tr. at 11:8-13 (Carter); id. at 12:10-22 (Outler, Carter); id. at 32:7-12 (Gagan, Carter).

26.     Alderete refused to allow the APD officers to enter his vehicle to retrieve his wallet. See Tr. at 11:13 (Carter).

27.     Carter thought that Alderete did not want the APD officers to retrieve his wallet, because "he didn't want us to open the door, [and] go inside."  Tr. at 13:5-6 (Carter).

28.     While one APD officer arrested Alderete, several other APD officers surrounded the Infiniti, see Carter Lapel Video at 17:00-20:20, looked inside the rear passenger door, see Carter Lapel Video at 18:15-18:20; id. at 19:55-20:05, looked inside the front passenger door window, see Carter Lapel Video at 20:10-20:15, and opened the driver's seat door and briefly

looked inside the vehicle, see Carter Lapel Video at 20:17-20:20.  See Motion ¶ 10, at 3 (asserting this fact).  See also Tr. at 31:3-32:6 (Gagan, Carter).

29.     Theroux is the APD officer who opened the driver's seat door.  See Tr. at 32:7-12 (Gagan, Carter).

30.     The APD officers wanted to make sure that the Infiniti's vehicle identification number ("VIN") matched the vehicle's temporary tag, see Motion ¶ 12, at 3 (asserting this fact); Incident Report at 3; Response at 3 (asserting this fact), because the vehicle was located "in a high crime area known for stolen vehicles," Incident Report at 3.  See Motion ¶ 12, at 3 (asserting this fact); Tr. at 13:15-18 (Carter); id. at 34:18-23 (Gagan, Carter); id. at 35:24-36:1 (Gagan, Carter).

31.     Temporary tags are easily replicated.  See Tr. at 35:7-8 (Carter).

32.     APD officers routinely inspect a vehicle's VIN when they stop a vehicle that has a temporary tag instead of a license plate.  See Tr. at 13:15-18 (Carter); id. at 13:22-14:6 (Outler, Carter).

33.     Carter inspected the Infiniti's VIN from outside the vehicle, but a glare on the windshield made it difficult to see the VIN on the dashboard.  See Response at 3 (asserting this fact); Incident Report at 3; Carter Lapel Video at 20:20-20:32; Tr. at 14:9-13 (Carter); id. at 36:14-16 (Gagan, Carter).

34.     Nothing was covering the VIN on the dashboard of Alderete's vehicle.  See Tr. at 36:7-13 (Gagan, Carter).

35.     Carter opened the driver's seat door to inspect the VIN printed on the doorjamb. See Motion ¶ 12, at 3 (asserting this fact); Incident Report at 3; Response at 3 (asserting this fact); Carter Lapel Video at 20:30-20:55; Tr. at 14:16-24 (Carter, Outler).

36.     When Carter opened the driver's seat door of Alderete's car, he "didn't know what [they] were going to do with the vehicle."  Tr. at 17:21-22 (Carter).

37.     Carter bent over and took approximately fifteen seconds to write down the VIN on a small spiral notebook.  See Carter Lapel Video at 20:35-20:50; Tr. at 14:16-24 (Carter, Outler).

38.     Carter did not enter the vehicle or place his foot inside the vehicle while obtaining the VIN.  See Carter Lapel Video at 20:30-20:55.

39.     When Carter stood up after inspecting the VIN inside the driver's seat door, he saw what appeared to be a black handgun between the driver's seat and the center console.  See Motion ¶ 12, at 3 (asserting this fact); Response at 3 (asserting this fact); Incident Report at 12; Hernandez Aff. ¶ 15, at 3; Carter Lapel Video at 20:55-21:10; Tr. at 14:25-15:1 (Carter).

40.     Carter is unsure whether Theroux saw the firearm when Theroux opened the driver's seat door, and Carter did not discuss the firearm with Theroux.  See Tr. at 32:15-21 (Carter).

41.     Alderete's vehicle was not being investigated when the APD officers arrested Alderete.  See Tr. at 33:23-34:16 (Gagan, Carter, Outler, Court).

42.     Carter wanted to verify that the warrant for his arrest was valid "before [he] was going to arrest him [and] place him into custody or take him to our station."  Tr. at 15:15-22 (Carter, Outler).

43.     Carter confirmed that the VIN matched Alderete's temporary tag and that Alderete had a valid outstanding warrant.  See Tr. at 15:7-8 (Carter); id. at 15:11-12 (Carter).

44.     Carter brought Alderete over to his squad car, arrested Alderete, and then Alderete "was searched incident to arrest."  Tr. at 16:3 (Carter).

45.     When the APD officers searched Alderete, they found in Alderete's pockets: (i) a .40 caliber bullet stamped with "40 S&W Federal," Incident Report at 3; (ii) $1,485.00 in cash; (iii) a small bag containing a rock-like substance; (iv) a bag with a white powdery substance; and (v) four rectangular pills stamped with "R309," Response at 3.   See Incident Report at 3; Hernandez Aff. ¶ 13, at 3; Carter Lapel Video at 34:05-38:25; Tr. at 16:9-19 (Carter).

46.     A search on Drugs.com indicated that the pills were likely alprazolam or Xanax, a controlled substance.  See Tr. at 16:12-13 (Carter).

47.     Alderete told the APD officers that he uses cocaine.  See Tr. at 16:14-16 (Outler, Carter).

48.     The APD officers then placed Alderete in the back of a police vehicle.  See Carter Lapel Video at 38:55-39:00.

49.     Following Alderete's arrest, Carter booked charges for the outstanding misdemeanor warrant, aggravated assault, and possession of cocaine, but not for drug trafficking. See Tr. at 40:4-22 (Gagan, Carter).

50.     The APD officers sealed the vehicle to preserve evidence and towed it so that a search warrant for the vehicle could be obtained.  See Motion ¶ 14, at 3 (asserting this fact); Response at 3 (asserting this fact); Incident Report at 3; Hernandez Aff. ¶ 16, at 3.

51.     The APD officers sealed and towed the vehicle, because they believed that the cellular telephones, drugs, and bullet were signs of drug trafficking and that there "would be more narcotics and possibly guns in the vehicle."  Tr. at 18:8-9 (Carter).

52.     Seeing the firearm during the VIN inspection also motivated the APD officers to tow the vehicle and seek a search warrant.  See Tr. at 18:10-17 (Outler, Carter).

53.     If the APD officers had not seen the firearm, they probably would have towed the vehicle and sought a search warrant for drug trafficking.  See Tr. at 18:22-23 (Carter); id. at 38:3-6 (Carter).

54.     The APD officers did not determine whether alternate means of removing Alderete's vehicle -- such as allowing a family member or friend remove the vehicle -- were available.  See Motion at 6 (asserting this fact).

55.     The warrant to search Alderete's vehicle was not related to drugs or drug trafficking.  See Tr. at 43:8-11 (Gagan, Carter); Affidavit for Search Warrant at 1-2 (dated May 7, 2019), filed in State Court May 14, 2019, filed in Federal Court December 16, 2019 (Doc. 35-1)("Roman Aff.").

56.     Four days later, on May 7, 2019, search warrant officer Cristina Roman "wrote up the search warrant and it was signed by a judge."  State of New Mexico Supplemental Report at 1, 9, filed December 2, 2019 (Doc. 33-3)("Search Warrant Supplemental Report").  See Tr. at 61:16-18 (Gagan).

57.     On May 8, 2019, Roman and Detective K. Brooks executed the warrant and found: (i) a firearm between the driver's seat and the center console; (ii) a black backpack on the back seat containing a firearm; (iii) a wallet inside the backpack containing identification items for people other than Alderete; (iv) drug paraphernalia inside the backpack; (v) two small bags containing a brown, powdery substance; (vi) five cellular telephones; and (vii) a small bag containing a white, crystal-like substance.  See Search Warrant Supplemental Report at 1, 3; Response at 4 (asserting this fact).

58.     On May 9, 2019, Roman obtained a second search warrant with a broader scope. See Search Warrant Supplemental Report at 1.

- 12 -

59.     On May 10, 2019, Roman conducted a second search of the vehicle and found nothing else significant.  See Search Warrant Supplemental Report at 1.

## PROCEDURAL BACKGROUND

On June 11, 2019, Victor J. Hernandez, a Task Force Officer with the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives, filed a criminal complaint against Alderete.  See Criminal Complaint at 1.  On July 9, 2019, a federal grand jury in Bernalillo County, New Mexico, indicted Alderete on the charge of unlawful, knowing possession of a firearm and ammunition in and affecting interstate commerce, having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  See Indictment at 1, filed July 9, 2019 (Doc. 14).  On July 16, 2019, Alderete was arraigned before the Honorable B. Paul Briones, United States Magistrate Judge for the United States District Court for the District of New Mexico.  See Clerk's Minute Sheet at 1, filed July 16, 2019 (Doc. 15).

### 1.      The Motion.

On November 5, 2019, Alderete filed the Motion.  See Motion at 1.  Invoking the Fourth Amendment to the Constitution, Alderete moves to suppress all evidence that APD officers seized on May 3, 2019, when APD officers searched Alderete's person and vehicle.  See Motion at 1. Alderete argues that warrantless searches are "'*per se* unreasonable under the Fourth Amendment'" and subject only to a few exceptions.  Motion at 4 (quoting Arizona v. Gant, 556 U.S. 332, 338 (2009), and citing United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir. 1994))(emphasis in Motion and not in Arizona v. Gant).  Alderete notes that one exception to the warrant requirement is an "inventory search."  Motion at 4 (citing Colorado v. Bertine, 479 U.S. 367 (1987)).  Alderete argues that, because APD officers located his firearm "pursuant to impoundment and inventory," the "government bears the burden of proving that its impoundment

of a vehicle and any ensuing inventory search satisfies the Fourth Amendment."  Motion at 4 (citing United States v. Sanders, 796 F.3d 1241, 1244 (10th Cir. 2015)).  Alderete argues that the United States must show that impounding his vehicle "was justified [] 'by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale.'"  Motion at 4 (quoting United States v. Sanders, 796 F.3d at 1248).  According to Alderete, police may not decide to impound and inventory a vehicle "''in bad faith or for the sole purpose of investigation.'''"  Motion at 4-5 (quoting United States v. Taylor, 592 U.S. 1104, 1108 (10th Cir. 2010)(quoting Colorado v. Bertine, 479 U.S. at 372, 374-75)).  Alderete asserts that law enforcement officers cannot base their decision to impound and inventory a vehicle on "criminal suspicion."  Motion at 5.

Alderete argues that the decision to impound his vehicle must comply with APD Procedural Orders and the Albuquerque City Code.  See Motion at 5 (citing United States v. Barraza, No. 15-CR-01015 MV, 2016 WL 9777163, at *4 (D.N.M. June 27, 2016)(Vázquez, J.)).  Alderete maintains that APD Procedural Orders authorize impounding vehicles when "'the driver has been incapacitated, hospitalized, arrested, or when the vehicle cannot be released to a responsible party. Officers will not tow if the vehicle is parked at the driver's place of residence, or his/her registered address.'"  Motion at 5 (quoting Albuquerque Police Department Procedural Order § 2-48-2(B) (dated October 15, 2018), filed November 5, 2019 (Doc. 21-3)("APD Procedural Order")). Alderete contends that the Albuquerque City Code authorizes impoundment

> "[w]hen a driver or person in control of a vehicle is lawfully taken into custody by a police officer _and_ the person is unable to immediately provide for the custody or removal of the vehicle _and_ the vehicle is left as described elsewhere in this division (A), or the location of the vehicle is such that a reasonable person would believe that its owner would desire its relocation or removal."

Motion at 5-6 (quoting Albuquerque City Code § 8-5-2-4(A)(7), filed November 5, 2019 (Doc. 21-4))(emphasis in Motion but not in Albuquerque City Code).  Alderete notes that the circumstances

described in § 8-5-2-4(A) include a vehicle that is "left unattended upon any bridge, viaduct or tunnel and [that] obstructs traffic," a vehicle that is "parked on a street or public way and [that] obstructs traffic," and a vehicle that is "illegally parked and blocking entrance to a private driveway or access to firefighting equipment."  Motion at 6 (citing Albuquerque City Code § 8-5-2-4(A)(1), (2), (4), (5)).  Alderete argues that his "vehicle was not 'left as elsewhere described in this division (A),' but was legally parked on private property," and that APD "did not determine if Mr. Alderete could provide for its removal."  Motion at 5 (quoting Albuquerque City Code § 8-5-2-4(A)(7)).  Alderete asserts that APD does not have the authority to violate the Albuquerque City Code, and, thus, the United States cannot satisfy the requirement in United States v. Sanders that impounding his vehicle comply with standardized policy.  See Motion at 6 (citing United States v. Barraza, 2016 WL 9777163, at *4).

Alderete also argues that the United States cannot show that a community-caretaking rationale justifies impounding his vehicle.  See Motion at 6.  Alderete quotes the United States v. Sanders factors for determining whether the decision to impound a vehicle is lawful under a community care-taking rationale:

> "(1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle[)]; (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner consented to impoundment."

Motion at 5 (quoting United States v. Sanders, 796 F.3d at 1250)(alteration added).  Alderete contends that his vehicle was located on private property and that there is "no evidence officers contacted the property owner."  Motion at 6.  Alderete argues that law enforcement did not seek an alternative to impoundment, "such as whether Mr. Alderete could secure another licensed driver to get the vehicle."  Motion at 6.  Alderete next asserts that there was no evidence of a crime other

than the "911 call alleging an assault."  Motion at 6.  Alderete notes that details from the 911 call -- such as the report that Alderete wore a white shirt -- were incorrect.  See Motion at 7.  Last, Alderete argues that he did not consent to impoundment.  See Motion at 7.  Alderete argues that his vehicle's impoundment is unlawful under United States v. Sanders and, thus, "the subsequent inventory search was also unlawful," and the "firearm and all other items found in the car must be suppressed."  Motion at 7 (citing United States v. James, 406 F. Supp. 3d 1025, 1048 (D.N.M. 2019)(Browning, J.)).

Alderete next argues that the APD officers "had no reason to suspect [that his] vehicle was stolen because there were no specific articulable facts demonstrating such."  Motion at 7.  Alderete notes that, in the Incident Report, the APD officer reported that "he opened the door to obtain the VIN due to [the vehicle] being in a 'high crime area known for stolen vehicles.'"  Motion at 7 (quoting Incident Report at 2).  Alderete further notes that the APD officer already had confirmed that he is the vehicle's registered owner.  See Motion at 7.  Alderete concedes that the United States Court of Appeals for the Tenth Circuit has held that "'[a] driver *who has committed a traffic violation* does not have a reasonable expectation of privacy in his vehicle's VIN, even if it is not in plain view.'"  Motion at 7 (quoting United States v. Miller, 84 F.3d 1244, 1251 (10th Cir. 1996), and citing New York v. Class, 475 U.S. 106, 113-14 (1986))(emphasis in Motion but not in United States v. Miller).  Alderete emphasizes, however, that he had not committed a traffic violation:

> His vehicle was parked lawfully on private property.  Police made contact with him purportedly for a welfare check and eventually arrested him on an unrelated traffic warrant.  It was clear officers were not treating this interaction as a traffic stop.  They did not ask Mr. Alderete to provide vehicle registration or insurance information.  His expectation of privacy in the contents of his vehicle was therefore different from that of an ordinary traffic stop.

Motion at 8.

Alderete also notes that, in New York v. Class, the Supreme Court of the United States of America stated that its "'holding today does not authorize police officers to enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile. If the VIN is in the plain view of someone outside the vehicle, there is no justification for governmental intrusion.'" Motion at 8 (quoting New York v. Class, 475 U.S. at 119). Alderete adds that the Tenth Circuit has recognized the same limitation on police officers entering a vehicle to obtain the VIN. See Motion at 8 (citing United States v. Caro, 248 F.3d 1240, 1245 (10th Cir. 2001); United States v. Miller, 84 F.3d at 1251). Alderete notes that the APD officer who obtained the VIN says that "'the VIN in the windshield was not easy to read.'" Motion at 9 (quoting Incident Report at 2). Alderete argues, however, that "a subsequent photograph taken by APD shows that the VIN was visible through the windshield." Motion at 9 (citing Photograph of VIN, filed November 5, 2019 (Doc. 21-2)). Alderete concludes by arguing that the APD officers' contention that the VIN was difficult to read is "evidence that law enforcement wanted access to the passenger compartment of the vehicle as 'a ruse for a general rummaging in order to discover incriminating evidence.'" Motion at 9 (quoting United States v. James, 406 F. Supp. 3d at 1041).

### 2.    **The Response.**

On December 2, 2019, the United States responded to the Motion. See Response at 1. The United States argues that "[w]hether Defendant's car was properly subject to some form of warrantless search, [] and indeed whether Officer Carter's VIN inspection itself was a warrantless search, are not questions this Court need resolve." Response at 4. The United States argues that the APD officers had probable cause to seek a search warrant for Alderete's car -- even if Carter had not seen the firearm when obtaining the VIN on the vehicle's doorjamb -- because of "the firearm assault allegations against Defendant, the four cell phones in plain view in his car, and the

firearm ammunition, cash, and narcotics found on his person."  Response at 4-5.  According to the United States, "[a]ll of the necessary incriminating evidence against Defendant either had already been discovered or inevitably would be discovered during the lawful warrant search."  Response at 5.

The United States argues that the "critical question" under the inevitable-discovery doctrine is "whether there existed some 'investigation that inevitably would have led to the evidence.'"  Response at 5 (quoting United States v. Larsen, 127 F.3d 984, 987 (10th Cir. 1997)). The United States contends that evidence that the government first discovers during an unconstitutional search is admissible if the government later discovers the evidence during a valid search.  See Response at 5 (citing Murray v. United States, 487 U.S. 533, 542-44 (1988); United States v. Cunningham, 413 F.3d 1199, 1203-05 (10th Cir. 2005)).  The United States avers that the "inevitable discovery doctrine applies here, even if the Court were to find that Officer Carter's VIN inspection was an unlawful warrantless search."  Response at 5.  The United States notes that, when Carter obtained the VIN: (i) other APD officers had arrested Alderete on an open misdemeanor warrant; (ii) Alderete was the primary suspect for firearm assault based on the 911 call; (iii) the APD officers had seen at least four cellular telephones inside Alderete's vehicle, which they viewed as "possible evidence of drug trafficking"; and (iv) the APD officers knew that Alderete had a felony record.  Response at 5-6.  According to the United States, "[t]hese facts, coupled with Officer Carter's spotting of a firearm in the car, led to the determination to seal and seek a search warrant for the car."  Response at 6.  The United States argues that "the fact that the incriminating evidence was later seized during a lawful warrant search cures any constitutional issue."  Response at 6 (citing Murray v. United States, 487 U.S. at 542-44).

The United States asserts that the APD officers inevitably would have discovered the firearm inside Alderete's car, even if Carter had not opened Alderete's car door to obtain the VIN. See Response at 6. The United States notes that the APD officers searched Alderete's person after obtaining the VIN and incident to his earlier arrest. See Response at 6. The United States says that the APD officers "found nearly $1,500 in cash, firearm ammunition, and three separate controlled substances" on Alderete's person. Response at 6. The United States argues that Alderete's "possession of ammunition alone is sufficient to support the current federal charge." Response at 6 n.1. The United States asserts that the evidence found on Alderete's person and the four cellular telephones that APD officers saw in plain view in Alderete's car "inevitably would have led the APD officers to seek a search warrant for the car, even if no firearms had been seen therein." Response at 6. The United States concludes by stating that, "[w]ithout question, a search warrant would have been requested, and the incriminating evidence found inside the car would have further supported the felony charges against Defendant." Response at 6. The United States thus argues that the Court should deny the Motion. See Response at 7.

**3.      The Reply.**

On December 16, 2019, Alderete replied to the Response. See Defendant's Reply to the United States' Response in Opposition to Defendant's Motion to Suppress Evidence at 1, filed December 16, 2019 (Doc. 35)("Reply"). Alderete argues that the United States "does not address Mr. Alderete's claim the search is not legally valid as an impoundment and inventory, and thus must agree." Reply at 1. Alderete also requests that the Court address his argument that his vehicle's impoundment and inventory were unlawful. See Reply at 1. Alderete asserts that the United States "does not attempt to justify the search" on the grounds that Carter's opening the driver's seat door to obtain the VIN was lawful. Reply at 1. Alderete argues that

the only plausible basis for the search rests on the government's argument that discovery was inevitable because officers would have obtained a warrant based on four circumstances: (1) Mr. Alderete was the primary firearm assault suspect based on the original call for service; (2) officers observed four cell phones in his car; (3) Mr. Alderete had a felony record; and (4) officers found cash, a single round of ammunition, and alleged controlled substances on his person.

Reply at 1-2.

Alderete recognizes that inevitable discovery is an exception to the exclusionary rule for warrantless searches. See Reply at 2 (citing Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Christy, 739 F.3d 534, 540-41 (10th Cir. 2014); United States v. Owens, 782 F.3d 146, 152 (10th Cir. 1986)). Alderete argues that, because the United States contends that the APD officers would have obtained a warrant even if Carter had not opened the driver's seat door to find the VIN, the Court "must determine 'how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.'" Reply at 2 (quoting United States v. Souza, 223 F.3d 1197, 1204 (10th Cir. 2000)). Alderete lists four factors from United States v. Souza for the Court to consider:

> "1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

Reply at 2 (quoting United States v Christy, 739 F.3d at 542, and citing United States v. Souza, 223 F.3d at 1204).

Alderete argues that "[a]ll four *Souza* factors suggest the Court cannot have a high level of confidence that absent the illegal search a warrant inevitably would have been issued and the evidence obtained." Reply at 3. As to the first and third United States v. Souza factors, Alderete contends that the APD officers did not obtain a search warrant until "long after officers observed

the gun in the car," and that Roman did not submit an affidavit for a search warrant until "over a month after Mr. Alderete's arrest and charging in state court."  Reply at 3 (citing Roman Aff. at 1). Alderete notes that, in the Affidavit for Search Warrant, Roman reports that she is "'requesting a warrant to retrieve the firearm seen by officers in Robert's vehicle.'"  Reply at 3 (quoting Affidavit for Search Warrant at 2).  According to Alderete, this statement shows that the "warrant and illegal search are inextricably linked."  Reply at 3.

Turning to the second United States v. Souza factor, Alderete argues that the APD officers did not have probable cause to search his vehicle.  See Reply at 3.  Alderete argues that, when Carter opened Alderete's car door to obtain the VIN and observed the firearm next to the driver's seat, the APD officers "had not yet located the cash, ammunition, and alleged narcotics in his pockets, and had no support for an allegation of assault."  Reply at 3.  As to the fourth United States v. Souza factor, Alderete contends that the United States' contention that APD officers were "investigating the assault from the original 911 call suggests officers did 'jump the gun' and force the issue of a search by illegally entering the car at the scene."  Reply at 3 (quoting United States v Christy, 739 F.3d at 542).  Alderete also emphasizes that the APD officers did not locate the 911 caller, and the Family Dollar Store employees could not corroborate the 911 caller's assault report. See Reply at 3 (citing Carter Lapel Video).  Alderete further asserts that the "supervising officer was clear there was no probable cause and no victim on an assault charge, and officers could conduct a welfare check only" when the APD officers approached Alderete's vehicle.  Reply at 3-4.  According to Alderete, the United States' assertion that the "911 call would have provided probable cause for a warrant only furthers Mr. Alderete's argument that officers unlawfully entered the vehicle as pretext for an investigation."  Reply at 4.

- 21 -

Alderete reiterates that the United States "cannot prove by a preponderance that the evidence would have inevitably been discovered independent of the constitutional violation." Reply at 4. Alderete argues that, although the United States asserts that the APD officers had probable cause to obtain a warrant, "'probable cause on its own is not enough; inevitable discovery requires that the district court have a high level of confidence that the warrant would have -- not could have -- been issued, and the government bears the burden of proof.'" Reply at 4 (quoting United States v Christy, 739 F.3d at 534 n.5)(internal quotation marks omitted). Alderete argues that the facts do not instill a "'high level of confidence'" that the APD officers would have obtained the warrant had Carter not observed the firearm while recording the VIN. Reply at 4 (quoting United States v Christy, 739 F.3d at 534 n.5). Alderete contends that the four cellular telephones and Alderete's criminal record "do not establish 'a fair probability' that contraband or other evidence would be found in the vehicle." Reply at 4 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). According to Alderete, "[t]here are myriad innocent explanations for having multiple cell phones, and a person's status as a felon is not probable cause to search him or his belongings." Reply at 4. Finally, Alderete notes that the APD officers arrested him on an outstanding misdemeanor traffic warrant, conducted a search incident to the arrest, and "found cash, alleged narcotics, and a single round of ammunition in Mr. Alderete's pocket." Reply at 5. Alderete argues that, "[e]ven if the Court concludes this discovery *could provide* probable cause to search the vehicle, it does not follow that the Court can conclude with a high level of confidence this search was inevitable and independent of the illegal police actions." Reply at 5 (emphasis in original).

4.        **The February 3, 2020, Hearing**.

The Court held a hearing on February 3, 2020.  See Tr. at 1.  Alderete argued that the "evidence will show that officers unlawfully entered" his vehicle.  Tr. at 2:24-25 (Gagan).  Alderete also argued that the United States' argument that "the firearm would have been inevitably discovered pursuant to a search warrant regardless of any unlawful entry fails because the Government cannot meet the four prong[s]" from United States v. Souza.  Tr. at 3:2-6 (Gagan).  The United States countered that Carter "properly and legally opened the defendant's car door" to obtain the VIN, "and when he did that, he saw in plain view between the driver's seat and the center console a firearm."  Tr. at 3:16-18 (Outler).  The United States noted that the firearm is the "primary evidence in this case."  Tr. at 3:20 (Outler).  The United States also contended that, even without Carter seeing the firearm, the APD officers had enough evidence of drug trafficking from their plain view of the vehicle and their search of Alderete's person.  See Tr. at 3:21-4:4 (Outler).  The United States then called Carter to testify.  See Tr. at 4:4-6 (Outler).

The United States presented Carter with the Incident Report, which Carter completed, and the Court admitted the Incident Report into evidence as the United States' Exhibit 2 to the hearing.  See Tr. at 5:5-18 (Outler, Court, Gagan).  Carter testified that he was present at Alderete's arrest as an arresting officer.  See Tr. at 5:25 (Carter).  Carter stated that he and several other APD officers responded to a 911 call about an aggravated assault with a deadly weapon near the Family Dollar Store.  See Tr. at 6:3-8 (Carter, Outler).  Carter stated that, when he arrived at the Family Dollar Store, a tan Infiniti was parked in the parking lot.  See Tr. at 7:14-15 (Carter).  Carter testified that, before he arrived, "another officer had obtained the license plate of that vehicle and learned that the registered owner of the vehicle had a warrant for his arrest."  Tr. at 7:16-18

(Carter).  Carter stated that the vehicle's owner is Robert Alderete, according to the officer's search.  See Tr. at 7:21 (Carter).

Carter testified that a person who appeared unconscious sat in the vehicle's driver's seat. See Tr. at 7:22-8:1 (Outler, Carter).  Carter said that the APD officers announced using their PA system that they are the "Albuquerque Police" and asked the person in the vehicle to exit for approximately ten to twelve minutes.  Tr. at 8:5-18 (Outler, Carter).  Carter testified that, because the person in the vehicle did not move, Carter and the other APD officers approached the vehicle, opened the rear passenger door, and told Alderete to step out of the vehicle.  See Tr. at 8:22-9:1 (Carter, Outler).  Carter said that, when they opened the rear passenger door, he saw two cellular telephones on the front passenger seat and two cellular telephones on the man's lap.  See Tr. at 9:2-7 (Carter, Outler).  Carter testified that having multiple cellular telephones "was a sign of drug trafficking."  Tr. at 9:11 (Carter).  Carter said that the man in the vehicle awoke, stepped out of the vehicle, and closed the driver's seat door.  See Tr. at 10:3-6 (Carter).  Carter stated his belief that the man shut the door, because he "didn't want us to see what was in the car."  Tr. at 10:12-13 (Carter).

Carter said that the man identified himself as Robert Alderete.  See Tr. at 11:5-6 (Carter). Carter said that an APD officer patted down Alderete's body, handcuffed him, and told him to sit. See Tr. at 11:4-8 (Carter).  Carter testified that the officer handcuffed Alderete, because there was an outstanding warrant for Alderete's arrest, and the officer patted down Alderete's body to check for weapons.  See Tr. at 11:14-12:5 (Outler, Carter).  Carter stated that the APD officers asked Alderete for identification, and Alderete said his identification was in his pocket.  See Tr. at 11:7-9 (Carter).  According to Carter, Alderete did not have an ID in his pocket, so an APD officer asked Alderete if he could look for Alderete's ID in his wallet, which the officer believed he could

see in the vehicle's front seat.  See Tr. at 11:8-13 (Carter); id. at 12:10-22 (Outler, Carter).  Carter

said that Alderete told the officer "no."  Tr. at 11:13 (Carter).  Carter stated his belief that it is

significant that Alderete did not want an APD officer to retrieve Alderete's wallet from inside the

vehicle, because "[i]t meant that he didn't want us to open the door, [and] go inside."  Tr. at 13:5-

6 (Carter).

        Carter said that, after the APD officer handcuffed Alderete, Carter decided to "verify that

the VIN matched [the] license plate on the vehicle.  Because the vehicle had a temp tag, and it's

common for me to ensure that the temp tag matches the VIN of the vehicle."  Tr. at 13:15-18

(Carter).  Carter testified that, based on his training and experience, it is routine to check a vehicle's

VIN when the vehicle has a temporary tag.  See Tr. at 13:22-14:6 (Outler, Carter).  The United

States then asked Carter how he checked the VIN, and Carter responded: "I first went to look at

the VIN on the windshield. . . .  [I]t was a very sunny day, I couldn't see the VIN clearly on the

windshield so I opened up the driver's side door to check the VIN sticker."  Tr. at 14:9-13 (Carter).

Carter said that he opened the driver's seat door, bent down to read the VIN on the door, and then

stood up.  See Tr. at 14:16-24 (Carter, Outler).  Carter said that, as he stood, he "noticed a gun, a

handgun wedged in between the driver's seat and the center console."  Tr. at 14:25-15:1 (Carter).

Carter testified that it was "easy" to see the handgun.  Tr. at 15:4 (Carter).  Carter said that he then

"walked over to [his] vehicle to verify the VIN.  And [to] verify Mr. Alderete's warrant."  Tr.

at 15:7-8 (Carter).  Carter testified that "the VIN matched the vehicle and [] Mr. Alderete's warrant

was confirmed valid."  Tr. at 15:11-12 (Carter).  The United States asked whether "Alderete had

already been arrested on the open warrant."  Tr. at 15:13-14 (Carter).  Carter responded that

Alderete had been "detained" and explained that he had to verify that the warrant for his arrest was

valid "before [he] was going to arrest him [and] place him into custody or take him to our station." Tr. at 15:15-22 (Carter, Outler).

Carter testified that, after he verified that the warrant for Alderete's arrest was valid, he brought Alderete over to his squad car, and Alderete "was searched incident to arrest." Tr. at 16:3 (Carter). Carter said that the APD officers found three different types of drugs in his pocket, which Carter suspected were "cocaine, a rock of crack, and then some loose pills." Tr. at 16:9-19 (Carter). Carter said that he ran a search on Drugs.com and determined that the pills were alprazolam. See Tr. at 16:12-13 (Carter). Carter testified that Alderete told the APD officers that he uses cocaine. See Tr. at 16:14-16 (Outler, Carter). Carter said that the APD officers also found a "40 caliber bullet," "1,485 [dollars] in cash," and a "set of mailbox keys." Tr. at 16:21-17:9 (Carter).

Carter next said that, when he opened the driver's seat door of Alderete's car, he "didn't know what [they] were going to do with the vehicle." Tr. at 17:21-22 (Carter). Carter said he and the APD officers ultimately decided to "seal[] the vehicle and [have] it towed," because they had found the four cellular telephones in the car, three different kinds of drugs in Alderete's possession, and a bullet in Alderete's pocket. Tr. at 17:25 (Carter). Carter testified that he believed that the cellular telephones, drugs, and bullet were signs of drug trafficking, and that there "would be more narcotics and possibly guns in the vehicle." Tr. at 18:8-9 (Carter). Carter noted, however, that he already had seen what he believed to be a firearm and that the firearm "informed his decision to seek a search warrant of the car." Tr. at 18:10-17 (Outler, Carter). Carter testified that, if he had not seen the firearm, he and the APD officers would have done "[t]he same thing, we would have sealed [the vehicle] and obtained a search warrant." Tr. at 18:22-23 (Carter). The United States then requested to play parts of Carter Lapel Video, which the Court admitted into evidence as

Defendant's Exhibit B.  See Tr. at 19:9-21:3 (Outler, Court, Gagan).  The United States played

parts of Carter Lapel Video.  See Tr. at 20:13 (Outler).

Alderete began his cross-examination of Carter.  See Tr. at 21:15-19 (Court, Gagan).

Carter testified that, although he was the lead officer for the 911 call, his sergeant, who is above

him in rank, was also present at the scene.  See 22:3-18 (Gagan, Carter).  Carter said that the 911

call occurred at 5:17 p.m., he was dispatched at 5:19:59 p.m., and he arrived at the scene at 5:29:36

p.m.  See Tr. at 24:4-13 (Carter, Gagan).  Carter said that he knows that APD officers could not

find the person who made the 911 call.  See Tr. at 24:15-18 (Gagan, Carter).  Carter also said that

one APD officer spoke to a Family Dollar Store employee and that the employee "had not seen

any kind of assault or altercation involving" the person in the Infiniti.  Tr. at 25:9-15 (Gagan,

Carter).  Carter stated that, at that time, nothing had changed, he did not have probable cause or

reason to investigate the alleged assault, and he had not talked to any alleged victims or witnesses.

See Tr. at 25:21-26:7 (Gagan, Carter).  Carter testified that, twelve minutes after the 911 call,

Alderete appeared to be sleeping, and Carter's sergeant eventually authorized a welfare check.  See

Tr. at 26:12-23 (Gagan, Carter).  Alderete again confirmed that he obtained the vehicle's

temporary tag, verified that Alderete was the registered owner, and discovered that Alderete had a

"misdemeanor traffic warrant."  Tr. at 27:7-19 (Gagan, Carter).  Carter testified that at least four

APD officers then approached the vehicle's passenger side with their guns drawn to conduct a

welfare check.  See Tr. at 27:20-28:13 (Gagan, Carter).  Carter confirmed that one APD officer

opened the rear passenger door, Alderete exited the vehicle as instructed, and Alderete closed the

driver's seat door.  See Tr. at 28:14-25 (Gagan, Carter).  Carter testified that APD officers

immediately began patting down Alderete, who had identified himself, and then the APD officers

handcuffed Alderete, because they believed that there was a warrant for Alderete's arrest.  See Tr.

at 29:1-12 (Gagan, Carter).  Carter confirmed that the arrest warrant was the only reason that Alderete was detained, because the APD officers had not found the victim or any witness and thus did not have probable cause to arrest him for the alleged assault.  See Tr. at 29:13-22 (Gagan, Carter).

Carter then testified that the 911 caller said that the individual who allegedly assaulted him was wearing a white shirt with visible tattoos all over his body, but Alderete was wearing a black shirt when he exited the vehicle and did not have visible tattoos.  See Tr. at 30:16-31:2 (Gagan, Carter).  Alderete played part of Carter Lapel Video beginning at 20:05, and Carter confirmed that APD officers left open the back passenger door after approaching Alderete's vehicle and, after they detained Alderete, an APD officer looked into the vehicle through the front passenger window, and another APD officer opened the driver's seat door.  See Tr. at 31:3-32:6 (Gagan, Carter).  Carter said that the APD officer who opened the driver's seat door was Theroux, the same officer who observed Alderete's wallet inside the vehicle.  See Tr. at 32:7-12 (Gagan, Carter). Alderete asked if Carter knew whether Theroux saw the firearm when Theroux opened the driver's seat door, and Carter responded that he was unsure and did not discuss the firearm with Theroux. See Tr. at 32:15-21 (Carter).  Carter testified that it is routine to check VINs on vehicles that he investigates and that his sergeant ordered him to check the VIN for Alderete's vehicle.  See Tr. at 33:9-15 (Gagan, Carter).  Carter testified, however, that Alderete's vehicle was not being investigated when the APD officers arrested Alderete.  See Tr. at 33:23-34:16 (Gagan, Carter, Outler, Court).  Carter confirmed that, in the Incident Report, he wrote that the Family Dollar Store was located in "a high crime area known for stolen vehicles," which is why he wanted to verify that the VIN matched the vehicle's temporary tag.  Tr. at 34:18-23 (Gagan, Carter).  Carter explained that a "temp tag is easy to be replicated or be faked and that's why we check."  Tr.

at 35:7-8 (Carter).  Carter testified that there were no other signs that the vehicle might be stolen.  See Tr. at 34:24-35: 4 (Gagan, Carter).  Carter again reiterated that the only reasons why he checked the VIN were that the vehicle had a temporary tag and the vehicle was located in a high-crime area.  See Tr. at 35:24-36:1 (Gagan, Carter).

Carter testified that the VIN is typically visible from outside a vehicle on the dashboard.  See Tr. at 36:2-6 (Gagan, Carter).  Carter said that Alderete's vehicle had its VIN on the dashboard and nothing was covering it.  See Tr. at 36:7-13 (Gagan, Carter).  Carter testified that the VIN was difficult to see from outside the vehicle because of the windshield's glare.  See Tr. at 36:14-16 (Gagan, Carter).  Alderete then displayed the Photograph of VIN to Carter, and Carter testified that he could read the VIN in the photograph, even though there was a small glare in the photograph.  See Tr. at 36:17-37:1 (Gagan, Carter).  Carter stated that, because of the windshield's glare, he opened the driver's seat door to obtain the VIN on the door and that moment is when he saw the firearm.  See Tr. at 37:2-9 (Gagan, Carter).  Carter testified that, after he saw the firearm, the APD officers decided to seal and tow the vehicle for a warrant.  See Tr. at 37:22-38:2 (Gagan, Carter).  Carter said that "[i]t's possible" that the APD officers would have towed the vehicle, even if they arrested Alderete but did not find the firearm, because the APD officers saw multiple cellular telephones inside the vehicle, and found multiple drugs and a bullet in Alderete's pocket.  Tr. at 38:3-6 (Carter).  Carter said that he "would have gotten a warrant for drug trafficking."  Tr. at 38:16-18 (Gagan, Carter).  Carter testified, however, that, following Alderete's arrest, he booked charges for the outstanding misdemeanor warrant, aggravated assault, and possession of cocaine, but not for drug trafficking.  See Tr. at 40:4-22 (Gagan, Carter).  Carter said that he was not involved with obtaining the warrant or the subsequent search, and that he had not seen the Roman Aff. for the search warrant, and Alderete presented the Roman Aff. to Carter.  See Tr. at 42:11-20

- 29 -

(Gagan, Carter).   Carter testified that, according to the Roman Aff., the warrant to search Alderete's vehicle was not related to drugs or drug trafficking.  See Tr. at 43:8-11 (Gagan, Carter). The Court then admitted the Roman Aff. into evidence as Defendant's Exhibit K.  See Tr. at 44:16-17 (Court).

Carter testified that he did not take the Photograph of VIN and that he believes the photograph was taken during the search warrant's execution.  See Tr. at 45:1-13 (Outler, Carter). Carter said that the VIN in the Photograph of VIN is "much clearer" than the VIN on the day of Alderete's arrest.  Tr. at 45:21 (Carter).  Carter also said that, although he did not know what he and the other APD officers would do with Alderete's car when they detained Alderete, it was possible that they would tow the car, because of his arrest, but it was also possible that they would leave the car in the parking lot.  See Tr. at 46:1-13 (Outler, Carter).  Carter next testified that he booked charges against Alderete before the warrant's execution and that he would add additional charges based on the evidence that the search warrant revealed.  See Tr. at 47:5-8 (Outler, Carter). Carter then stepped down from the witness stand.  See Tr. at 48:7:9 (Court).

Alderete argued that Carter's "opening the door purportedly to view the VIN was a violation of Mr. Alderete's reasonable expectation of privacy."  Tr. at 49:13-16 (Gagan).  The Court interjected that it does not disagree with Alderete about the invasion of his privacy, but it noted that "the Tenth Circuit and the Supreme Court have gone the other direction on that."  Tr. at 49:22-23 (Court).  The Court stated:

> They give officers a certain amount of room when they're investigating a crime to inspect the vehicle, and one of them is they can look at the windshield, and they can look inside the car to see the VIN number.  I've always had a problem with them inspecting the VIN number, but in this case we actually have evidence both in written form and from the testimony of Mr. Carter that he had a practical reason why he needed to go inside the [vehicle].  And the Tenth Circuit and the Supreme Court seem to me to allow them to go inside and look at the inside VIN number, so

if I take those cases for what they say, and then it's in the plain solution and this one seemed to me plainer than other cases I've had I'm struggling to see what the constitutional problem is here under current law.

Tr. at 49:23-50:14 (Court).  Alderete responded that the Supreme Court and Tenth Circuit caselaw about VINs is "a little bit different" from Alderete's case.  Tr. at 50:19-20 (Gagan).  Alderete notes that, in United States v. Caro and United States v. Miller, the Tenth Circuit "limit[ed] the permissible scope of police intrusions aimed at checking a vehicle's VIN."  Tr. at 51:23-24 (Gagan).  Alderete also argued that he was not stopped for a traffic violation on a public roadway and that the APD officers had no reason to investigate his vehicle in relation to any crime.  See Tr. at 52:6-13 (Gagan).  Alderete further argued that the Tenth Circuit recognized in United States v. Miller that "a person has a reasonable expectation [of] privacy in the contents of their vehicle."  Tr. at 52:14-16 (Gagan).  Alderete added that nothing blocked Carter's view of the VIN on his dashboard.  See Tr. at 52:18-21 (Gagan).

The Court stated that it has presided over cases "where the officer could perfectly read the VIN number from the dashboard and still I thought the Tenth Circuit and Supreme Court cases said they could still go inside that vehicle and double-check it to see if it was still the same number on the inside."  Tr. at 52:24-53:3 (Court).  The Court also told Alderete that he could not "just rely on" New York v. Class.  Tr. at 53:6-7 (Court).  Alderete noted that, in United States v. Caro and United States v. Miller, the Tenth Circuit held that "if the VIN is visible from outside the vehicle the officer cannot enter the vehicle to read it."  Tr. at 53:12-14 (Gagan).

The Court said that it believes that the Tenth Circuit has "said otherwise over the last 20 years," Tr. at 53:19 (Court), and Alderete asserted that his "understanding of the case law is that the Tenth Circuit has allowed [officers] to enter the vehicle when [the VIN] cannot be read from the outside,"  Tr. at 53:23-25 (Gagan).  The Court stated that there is "sworn testimony here and

in the record that [the officers] couldn't read [the VIN]."  Tr. at 54:10-11 (Court).  Alderete

countered that the officer could not see the VIN because of the glare, not because Alderete blocked

the VIN, see Tr. at 54:12-14, and the Court reiterated that the officers nevertheless could not read

the VIN, see Tr. at 54:15-18 (Court).  Alderete argued that there were no traffic violations here,

unlike in much of the caselaw involving VINs, and the APD officers had "no probable cause" to

investigate the vehicle "on the alleged assault without" speaking to the 911 caller.  Tr. at 55:23-25

(Gagan).  The Court stated that the APD officers were "acting like they have reasonable suspicion

but are pretty concerned that they don't have probable cause."  Tr. at 56:24-57:2 (Court).  Alderete

then argued that the Court should follow New York v. Class, United States v. Caro, and United

States v. Miller, and hold "that there is some limit on the ability of law enforcement to open the

door and look for a VIN."  Tr. at 57:9-10.

Alderete argued that Carter "opening the door and searching the interior of the vehicle

cannot be justified as a look for a VIN."  Tr. at 58:1-2 (Court).  Alderete further asserted that Carter

was not sure that the APD officers would tow Alderete's vehicle before Carter opened the driver's

seat door and saw the firearm.  See Tr. at 58:5-9 (Gagan).  Alderete argued that towing his vehicle

did not follow the Albuquerque City Code and thus the towing "was not done [pursuant] to

standardized criteria."  Tr. at 58:21-22 (Gagan).  Alderete contended that the United States "has

not put on any evidence to attempt [to show that the] officer was acting according to standardized

criteria."  Tr. at 59:19-21 (Gagan).  Alderete also argued that the United States has not satisfied

the four factors for towing and impounding his car under a care-taking rationale.  See Tr. at 59:21-

60:12 (Gagan).  Alderete noted that the Search Warrant Supplemental Report focuses on evidence

of firearms, whereas Carter's testimony focuses on evidence of drug trafficking, because the APD

officers found four cellular telephones, over $14,000.00, and drugs in Alderete's possession.  See Tr. at 61:1-10 (Gagan).

Alderete next argued that the United States has not satisfied the four factors in United States v. Souza for invoking the inevitable discovery doctrine to the warrant requirement.  See Tr. at 61:10-15 (Gagan).  First, Alderete asserted that APD officers waited "four days after the officer found the gun in plain view at the scene" to begin the warrant process, which is a "long" time under United States v. Souza.  Tr. at 61:16-18 (Gagan).  Second, Alderete argued that there was no probable cause to search the car.  See Tr. at 61:25-62:1 (Gagan).  Third, Alderete concedes that the government obtained a search warrant, but he notes that the search warrant was premised on evidence of firearms, and not evidence of drug trafficking.  See Tr. at 62:9-19 (Gagan).  Fourth, Alderete argued that the APD officers "jumped the gun," because they did not have probable cause on the alleged assault and Carter "testified that the car was not being investigated as implicated in a crime."  Tr. at 63:8-9 (Gagan).  Alderete asserted that the fact that Alderete's vehicle had a temporary tag and was located in a "high crime area" are "meaningless factors" for establishing reasonable suspicion or probable cause that the vehicle was stolen.  Tr. at 63:15-21 (Gagan).  Alderete argued that the United States "seems" to "acknowledge [that the APD officers] didn't have much on the assault charge[,] that they were looking for other evidence, and [that] they wanted to force the [drug trafficking] issue by [opening] that car and seeing what was in [it]."  Tr. at 64:3-7 (Gagan).  Alderete further asserted that probable cause is not enough to justify the inevitable discovery exception and that the Court must have a "high level of confidence that the warrant would have been issued without the illegal search."  Tr. at 64:16-18 (Gagan).

The United States conceded that it at most had reasonable suspicion and not probable cause to arrest Alderete for the assault charge.  See Tr. at 65:11-66:2 (Court, Outler).  The United States

argued, however, that it had probable cause to arrest Alderete for the outstanding misdemeanor warrant after one of the APD officers determined that Alderete was the vehicle's registered owner based on the temporary tag and that Alderete had an outstanding warrant for his arrest, which the APD officer determined before Carter opened the driver's seat door.  See Tr. at 66:6-24 (Outler, Court).  The Court noted that Carter testified that the APD officers did not have "probable cause for anything at [that] point."  Tr. at 66:25-6 (Court).  The United States argued that the APD officers "eventually" had "probable cause for multiple charges."  Tr. at 67:8-9 (Outler).  The Court asked: "But at what point . . . do you contend the first probable cause existed[?]"  Tr. at 67:10-12 (Court).  The United States responded that probable cause first existed "[a]t the point where Mr. Alderete identified himself."  Tr. at 67:13-14 (Outler).  The United States said that, at the moment when Alderete identified himself, the APD officers had not obtained yet his vehicle's VIN or seen the firearm inside Alderete's vehicle.  See Tr. at 67:22-68:2 (Court, Outler); id. at 68:15-18 (Court, Outler).

The United States argued that Albuquerque's procedures for towing vehicles is "relevant to [the inevitable discovery] inquiry, but we are not making the argument that [the firearm] was found incident to an inventory."  Tr. at 69:2-4 (Outler).  The United States explained that, at the time that Carter arrested Alderete, Carter "didn't know what the fate of the car was going to be." Tr. at 69:9-11 (Outler).  The United States said that the Albuquerque Procedural Orders mandate that a car be towed "if the defendant has been arrested and other arrangements [for removing the car] can't be made."  Tr. at 69:13-14 (Outler).  The United States argued that, when the APD officers tow a vehicle, "the very first part of the procedure for that is to do a VIN check."  Tr. at 69:19-20 (Outler).  The United States contended that, if a third party came to remove the vehicle "then we almost are in a situation of a traffic stop where the officer is double-checking the VIN

against the car's registration to make [sure] the car hasn't been stolen simply for the purpose of making sure that the car is drivable on the highway again." Tr. at 70:4-9 (Outler). The Court said that it disagrees with some of the Supreme Court's and Tenth Circuit's rulings, but the Court interprets those rulings as holding that, if an officer stops a vehicle, the officer can look inside the vehicle to find the VIN. <u>See</u> Tr. at 70:25-71:4 (Court). The United States said that it agreed with the Court's interpretation of the caselaw. <u>See</u> Tr. at 71:6-7 (Outler).

The United States said there are relevant post-<u>United States v. Miller</u> cases, such as <u>United States v. Chavira</u>, 467 F.3d 1286 (10th Cir. 2006). <u>See</u> Tr. at 71:11-13 (Outler). The United States argued that <u>United States v. Chavira</u> "is a case where the officer both looked at the outside VIN and the inside the doorjamb VIN and the Tenth Circuit found that it was proper actually for the deputy to do both." Tr. at 71:13-17 (Outler). The United States confirmed that there was nothing wrong with the outside VIN in <u>United States v. Chavira</u>, and it asserted that,

> when the officer has actually been able to verify the VIN from outside the car, then and only then is there no reason for the officer to open the car door, . . . and it's not even a question of whether he's able to or not. If he has not actually verified the VIN from outside the car, I believe the law allows him to open the car door to check the VIN for the first time.

Tr. at 71:23-72:6 (Outler). The United States noted that Carter tried to read the VIN outside the vehicle, but he was unable to read it and thus opened the driver's seat door. <u>See</u> Tr. at 72:8-11 (Outler). The United States argued, however, that precedent permits officers to go "straight to opening the car [door] to read the VIN." Tr. at 72:11-12 (Outler). The United States contended that officers do not need probable cause or a reasonable suspicion to obtain the VIN from inside the vehicle, because "there is no reasonable expectation [of] privacy in [the] VIN." Tr. at 72:18-19 (Outler). The United States further noted that Carter squatted down outside the vehicle and did

not go inside the vehicle to obtain the VIN, and then, when Carter stood up, he saw the firearm in plain view.  See Tr. at 72:24-73:6 (Outler).

The United States also argued that it could "find no distinction" in the caselaw between obtaining a VIN "in the context of a traffic stop, and in the context of any other type of police investigation."  Tr. at 73:8-11 (Outler).  According to the United States, the Supreme Court and the Tenth Circuit caselaw have held that "the inquiry really ends at the point where . . . there is no reasonable expectation of privacy in a VIN."  Tr. at 73:22-25 (Outler).  The United States asserted:

> [I]t doesn't really matter [in] what context the VIN is being inspected.  Whether it's as a part of a traffic stop or part of another investigation, there is no reasonable expectation of privacy [] and if the officer has any reason to be there, he's able to inspect [the] VIN without any kind of fourth amendment problem.

Tr. at 74:2-7 (Outler).  The United States reiterated that it is "only when the officer is unable or only when the officer has actually verified [the VIN] from the outside is he not allowed to open the car door and [in] all other contexts there is simply no Fourth Amendment problem with opening the car door to inspect the VIN."  Tr. at 74:10-15 (Outler).  The Court asked the United States to explain the significance of seeing the firearm inside the vehicle if the APD officers already had reasonable suspicion.  See Tr. at 74:18-23 (Court); id. at 75:2-5 (Court).  The United States responded that finding the firearm along with the 911 caller's description of Alderete and the alleged assault with a firearm "likely" provided "probable cause for arrest at this point on the aggravated assault charge."  Tr. at 75:19-21 (Outler).  The Court rebutted that Alderete is "not moving to suppress the arrest. . . .  [T]hey're moving to suppress the evidence, the gun itself."  Tr. at 75:24-76:1 (Court).  The Court said that adding another factor -- the firearm possession -- does not seem relevant or "constitutional[ly] significant" after the APD officers arrested Alderete.  Tr. at 76:20-21 (Court).  The United States then confirmed that this is a felon-in-possession-of-a-

firearm case and that, although the drugs "are likely to be relevant conduct for sentencing," the drugs are "not part of a charge."   Tr. at 77:13-14 (Outler).  The United States also said that the APD officers knew about Alderete's criminal history before they approached his vehicle.  See Tr. at 77:22-23 (Outler); id. at 77:25-78:3 (Outler).

The United States turned to the inevitable-discovery exception to the warrant requirement. See Tr. at 78:9-12 (Outler).  The United States explained that, when the APD officers approached Alderete's vehicle, they saw four cellular telephones in plain view -- two on the front passenger seat and two on Alderete's lap -- which Carter testified is evidence that Alderete traffics drugs. See Tr. at 78:14-21 (Outler).  The United States said that the APD officers arrested Alderete for the outstanding misdemeanor warrant, searched his person incident to the arrest, and found three different controlled substances, over $1,400.00, and a round of ammunition.  See Tr. at 78:25-79:7 (Outler).  The United States argued that these factors along with the 911 call reporting assault with a firearm "would have given Officer Carter and the other officers a firm basis to seek a search warrant, even if they had never seen the firearm."  Tr. at 79:12-15 (Outler).  The United States asserted that the "only question is would [the APD officers] have inevitably sought a search warrant[] and Officer Carter has said yes, they would have, and . . . [t]here is no question that [the firearms] would have been discovered."  Tr. at 79:18-22 (Outler).

Alderete then argued that the Honorable James A. Parker, Senior United States District Judge for the United States District Court for the District of New Mexico, discussed United States v. Chavira in United States v. Diaz-Gomez, CR No. 10-332 JP, 2010 WL 11483192 (D.N.M. Aug. 25, 2010)(Parker, J.).  See Tr. at 81:13-17 (Gagan).  Alderete argues that Judge Parker held that "officers are not permitted to open the door and look at the VIN on the door without some additional reason to be there, either that the VIN is not visible or they have some specific suspicion

or something about the car itself." Tr. at 80:18-23 (Gagan).  Alderete again argued that the fact

that the APD officers were not conducting a traffic stop is important and that the Court should

conclude "that the officer should not have opened the door to look at the VIN."  Tr. at 81:1-3

(Gagan).

The Court noted that the sun's glare on Alderete's windshield made it difficult to read the

VIN on Alderete's windshield, and the Court indicated that it thinks the law allows an officer to

obtain the VIN from inside a vehicle when the officer is unable to read the VIN on the dashboard.

See Tr. at 81:4-9 (Court).  The Court said that it is "not even sure" that the inability to read the

VIN on a vehicle's outside is "necessary" to justify an officer's decision to obtain the VIN from

inside a vehicle.  Tr. at 81:9-10 (Court).  The Court added that it has expressed its disagreement

with this body of law in similar VIN-related cases, because it thinks that it is an invasion of privacy

to stop a vehicle and to obtain its VIN without any reason to believe the vehicle is stolen.  See Tr.

at 81:11-18 (Court).  The Court said that it will "have to think a little bit about [whether] this [case]

is analogous to a traffic stop" and that it is inclined to deny the Motion.  Tr. at 81:19-24 (Court).

## RELEVANT LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.

It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or

affirmation, and particularly describing the place to be searched, and the persons or things to be

seized."  U.S. Const. amend. IV.  In determining whether a Fourth Amendment violation has

occurred, courts must "assur[e] preservation of that degree of privacy against government that

existed when the Fourth Amendment was adopted."  United States v. Jones, 565 U.S. 400, 406

(2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant.  The hallmark of the Fourth Amendment is reasonableness."   United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.).  See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)).  "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls, 536 U.S. 822, 828 (2002)).  The Supreme Court of the United States has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

### 1.    Reasonable Government Searches.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 563 U.S. 452, 459 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).  See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).  "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,'

a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121.  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'" Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20)).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."  At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. at 119-120 (noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, and noting that "[w]hat is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population"); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.  This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."   Florida v. Jardines, 569 U.S. 1, 13 (2013)(Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch.

Dist. 47J v. Acton, Justice Scalia, writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park." 515 U.S. at 654 (internal citations omitted).

      **2.**      **Traffic Stops.**

A traffic stop is an investigative detention, see United States v. Toro-Pelaez, 107 F.3d 819, 823 (10th Cir. 1997), and is thus analyzed according to the principles that the Supreme Court set forth in Terry v. Ohio, 392 U.S. 1 (1968)("Terry"), see United States v. Kitchell, 653 F.3d 1206, 1216 (10th Cir. 2011)(concluding that a traffic stop is a Terry stop); United States v. Leon-Quijada, 107 F.3d 786, 792 (10th Cir. 1997). In Terry, the Supreme Court authorized police officers to conduct limited seizures and to search a person's outer clothing when the officer has reasonable suspicion that criminal activity may be afoot. See Terry, 392 U.S. at 30-31. The Tenth Circuit has concluded that traffic stops fall into the category of Terry stops. See United States v. Toro-Pelaez, 107 F.3d at 823-24 ("A traffic stop is a seizure within the meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."); United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *10 (D.N.M. Feb. 19, 2010)(Browning, J.); United States v. Hanrahan, No. CR 04-1978 JB, 2005 WL 2312746, at *4 (D.N.M. Aug. 12, 2005)(Browning, J.), aff'd, 508 F.3d 962 (10th Cir. 2007).

For officers to lawfully stop a vehicle, they must have "a particularized and objective basis for suspecting the particular persons stopped of criminal activity." United States v. Leos-Quijada, 107 F.3d at 792 (citing United States v. Cortez, 449 U.S. 411, 417-18 (1981)). Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been,

is, or is about to be engaged in criminal activity." United States v. Elkins, 70 F.3d 81, 83 (10th Cir. 1995)(citing United States v. Nicholson, 983 F.2d 983, 987 (10th Cir. 1993)). Accord United States v. Ramos, 194 F. Supp. 3d at 1156. Reasonable suspicion is not determined by any one factor but by the totality of the circumstances that the officer knew. See United States v. Ceballos, 355 F. App'x 226, 229 (10th Cir. 2009)(unpublished); United State v. Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. 325, 330 (1990)). Even if the officer does not form subjective reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop reasonable suspicion, the stop is proper. See United States v. Ceballos, 355 F. App'x at 229 (holding that an officer's "subjective characterization of his actions is irrelevant").

If a police officer observes a traffic violation, the officer has cause to execute a traffic stop. See Whren v. United States, 517 U.S. 806, 809-10 (1996)("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); United States v. Ramstad, 308 F.3d 1139, 1144 & n. 1 (10th Cir. 2002)(acknowledging that Whren v. United States "indicate[s] that probable cause is a *sufficient* ground for a stop," but explaining that reasonable suspicion is all that is necessary (quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001)(emphasis in United States v. Ramstad and United States v. Callarman). Even if the officer has an ulterior motive for executing the traffic stop -- i.e., to investigate some other suspected illegal conduct -- the officer can lawfully stop a vehicle that he or she observes violating the traffic laws. See Whren v. United States, 517 U.S. at 813-14; United States v. King, 209 F. App'x 760, 762 (10th Cir. 2006)(unpublished)("The constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved.")(citing Whren v. United States, 517 U.S. at 813). In other words, there is no constitutional prohibition on what are colloquially referred to as "pretext stops," so long as the

officer also has a constitutional basis for executing the stop.  United States v. Sedillo, 2010 WL 965743, at *10.

"A seizure for a traffic violation justifies a police investigation of that violation." Rodriguez v. United States, 575 U.S. 348, 354 (2015).  See Knowles v. Iowa, 525 U.S. 113, 117 (1998)(observing that the investigation into the traffic offense is "a relatively brief encounter" that is "more analogous to a so-called 'Terry stop' . . . than to a formal arrest")(quoting Berkemer v. McCarty, 468 U.S. 420, 439 (1984)).  The "tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' -- to address the traffic violation that warranted the stop, . . . and attend to related safety concerns."  Rodriguez v. United States, 575 U.S. at 354. Because the officer's purpose is to address the traffic infraction, the stop may last no longer than is necessary to effectuate that purpose.  See Illinois v. Caballes, 543 U.S. 405, 407 (2005).  The authority for the seizure therefore ends when the officer completes -- "or reasonably should have [] completed" -- the tasks tied to the traffic infraction.  Rodriguez v. United States, 1575 U.S. at 354.  See United States v. Hunnicutt, 135 F.3d 1345 (10th Cir. 1998)(observing that the traffic stop must last no longer than necessary to confirm or deny the suspicion that justified the stop -- the traffic offense); United States v. Ramos, 194 F. Supp. 3d at 1157.  In short, absent reasonable suspicion to justify an extended detention, an officer cannot "measurably extend" the stop beyond the time reasonably necessary to complete his traffic-related inquiries.  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. 323, 333 (2009)).

Beyond writing the traffic citation, an officer's mission includes "ordinary inquiries incident to [the traffic] stop."  Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-

60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway. See New York v. Class, 475 U.S. at 115 (concluding that "a demand to inspect the VIN, like a demand to see license and registration papers, is within the scope of police authority pursuant to a traffic violation stop").  The Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed respondent commit two traffic violations."  New York v. Class, 475 U.S. at 119.  See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike checking license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nonetheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- is subject to a reasonable expectation of privacy. New York v. Class, 475 U.S. at 118.  Checking a vehicle's VIN therefore has a similarly close connection to roadway safety as the ordinary inquiries, so it can fairly be characterized as part of the officer's traffic mission.

Officers may also engage in routine questioning while conducting the traffic stop but "only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'"  Rodriguez v. United States, 575 U.S. at 355 (quoting Arizona v. Johnson, 555 U.S. at 327-28).  See Muehler v. Mena, 544 U.S. 93, 101 (2005)(noting that, because unrelated inquiries did not "exten[d] the time [the petitioner] was detained[,] . . . no additional Fourth Amendment justification . . . was

required").  Accordingly, an officer may conduct certain unrelated checks during a lawful traffic stop, but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  Rodriguez v. United States, 575 U.S. at 355.

In Rodriguez v. United States, the Supreme Court held that a "seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation."  575 U.S. at 350-51 (alterations in original)(internal quotation marks and citationomitted).  There, a police officer issued a driver a traffic warning, and returned to the driver and to the passenger all of their documents.  See 575 U.S. at 351-52.  After "the justification for the traffic stop was 'out of the way'" and without permission from the driver, the officer: (i) instructed the driver to turn off the ignition, exit the vehicle, and stand by the patrol car; and (ii) deployed a K-9 to circle the vehicle twice to sniff for drugs.  575 U.S. at 352.  "[S]even or eight minutes had elapsed from the time [the officer] issued the written warning until the dog indicated the presence of drugs."  575 U.S. at 352.  The Supreme Court rejected the United States Court of Appeals for the Eighth Circuit's conclusion that the seven- or eight-minute delay constituted an acceptable "de minimis intrusion on Rodriguez's personal liberty."  575 U.S. at 353.  The Supreme Court concluded that the dog sniff, if performed without reasonable suspicion, measurably extended the detention and noted that the officer's authority to detain the driver "end[ed] when tasks tied to the traffic infraction are -- or reasonably should have been -- completed."  Rodriguez v. United States, 575 U.S. at 354.  See United States v. Sharpe, 470 U.S. 675, 686 (1985)(stating that, in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation")(alterations added).

3.      **Vehicle Searches**.

While an automobile stop may be made based on reasonable suspicion that the driver has committed a crime, see United States v. Toro-Pelaez, 107 F.3d at 823-24, an officer must have probable cause to believe that the vehicle contains contraband or other evidence of criminality to execute an automobile search, see United States v. Forbes, 528 F.3d 1273, 1277-78 (10th Cir. 2008)("[T]he Fourth Amendment unquestionably prohibits the search of a vehicle's interior unless law enforcement officials receive consent, have a warrant, or otherwise establish probable cause to support the search.").  Under the automobile-exception to the warrant requirement, however, a warrant is generally not required.  See Maryland v. Dyson, 527 U.S. 465, 466-67 (1999); United States v. Burgess, 576 F.3d 1078, 1087 (10th Cir. 2009)(citing California v. Acevedo, 500 U.S. 565, 580 (1991)).  The ongoing exigent circumstance that the vehicle might drive away has led the Supreme Court to conclude that a warrant is not required to search a vehicle.  See Maryland v. Dyson, 527 U.S. at 466-67 ("[W]here there [is] probable cause to search a vehicle[,] a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.")(citing United States v. Ross, 456 U.S. 798, 809 (1982))(internal quotes omitted); California v. Carney, 471 U.S. 386, 393-94 (1985).  Thus, as long as the investigating officer has probable cause to believe that the vehicle contains contraband or evidence of criminality, he or she may search the vehicle without a search warrant.  See United States v. Sedillo, 2010 WL 965743, at *11.

4.      **Consensual Searches**.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search and the consent is

"freely and voluntarily given," the search does not implicate the Fourth Amendment.  United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that: (i) the government "'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given'"; and (ii) "the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory," or, conversely, the "officer's pleasant manner and [ ] tone of voice;" (iii) the "prolonged retention of a person's personal effects such as identification," or, conversely, "the prompt return of the defendant's identification and papers;" (iv) the "absence of other members of the public," or, conversely, whether the stop occurs in "a public location such as 'the shoulder of an interstate highway, in public view;'" (v) the "officer's failure to advise the defendant that [he or] she is free to leave."  United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir. 1997)](citing and quoting numerous sources).  Other factors include: (vi) "the display of a weapon, [and (vii)] physical touching by the officer."  United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(some alterations in original).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010).  The inquiry is an objective one.  See United States v. Ringold, 335 F.3d 1168, 1172 (10th Cir. 2003).  "As long as a reasonable innocent person, as opposed to a person knowingly

carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." United States v. Laboy, 979 F.2d 795, 798 (10th Cir. 1992).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances. For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest in some circumstances that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary. See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers near a building's exits, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individuals] that they would be seized or detained in any meaningful way." United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted). Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon." United States v. Drayton, 536 U.S. at 205. Accordingly, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

A suspect may give consent through conduct rather than words. "To satisfy the first prong of the voluntariness requirement, a defendant's consent must be clear, but it need not be verbal.

Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." United States v. Guerrero, 472 F.3d at 789-90. See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1143 (D.N.M. 2014)(Browning, J.)(noting that consent "need not be spoken, but 'may instead be granted through gestures or other indications of acquiescence'"). For example, in United States v. Ringold, 335 F.3d 1168 (10th Cir. 2003), the Tenth Circuit held that an affirmative nod was sufficient to constitute consent. See 335 F.3d at 1175.

In United States v. Gordon, the suspect moved to suppress all physical evidence an officer seized from a locked duffle bag. See 173 F.3d at 765. The officer then asked to see the suspect's train passenger ticket and identification, inquired into his travel plans, and asked if he had any luggage. See 173 F.3d at 765. The officer did not inform the suspect that he was free to leave or not answer her questions. See 173 F.3d at 765. The officer asked to search the suspect's luggage and the suspect gave his consent. See 173 F.3d at 765. She asked him whether he had any contraband, informing him that contraband was the subject of her search. See 173 F.3d at 765. When the officer encountered the suspect's locked bag, she asked him if he could open it. See 173 F.3d at 765. Although the suspect did not respond verbally, he "removed the key from his pocket and handed it to [the officer]." 173 F.3d at 766. The Tenth Circuit concluded that the suspect's "voluntary relinquishment of the key evidenced his consent to search the locked duffle bag." 173 F.3d at 765.

The Tenth Circuit proceeded to describe how the search of the locked bag, which was inside the suspect's other luggage, did not exceed the scope of the suspect's consent to search his luggage. See 173 F.3d at 766. The ultimate issue in determining the scope of consent is what a reasonable person would have understood the suspect's consent to include. See United States v.

Wacker, 72 F.3d 1453, 1470 (10th Cir. 1995).  The Tenth Circuit determines whether a search remains within the boundaries of the consent given based on the totality of the circumstances.  See United States v. Sanchez, 89 F.3d 715, 719 (10th Cir. 1996).  When an officer tells a suspect the object of his search and the suspect consents to a search for that object within a certain area, the Tenth Circuit has "consistently and repeatedly" held that the suspect thereby consents to a search of any area within the confines of the officer's request where the object may be found.  United States v. Peña, 143 F.3d at 1368 (concluding that, "[b]ecause Peña consented to a search for drugs, he consented to a search of any area in the motel room where one might hide drugs").  See United States v. McRae, 81 F.3d 1528, 1538 (10th Cir. 1996)(holding that search did not exceed the scope of consent given when the suspect gave the officers consent to search his vehicle's trunk, and they found contraband when they lifted up the trunk's carpet); United States v. Wacker, 72 F.3d at 1470 (holding that, "where a suspect does not limit the scope of a search, . . . an officer is justified in searching the entire vehicle"); United States v. Santurio, 29 F.3d 550, 553 (10th Cir. 1994)(holding that the removal of "a few screws from the strip holding down the carpet which covered the metal compartment containing the packages of cocaine" did not exceed the scope of consent to search the car; United States v. Mains, 33 F.3d 1222, 1227 (10th Cir. 1994)(holding that, because the defendant consented to a search of his apartment for another person, he consented to the search of any area large enough to accommodate that individual).

Notably, if the suspect fails to object to the officer's search, it indicates that "the search was within the scope of consent."  United States v. Gordon, 173 F.3d at 766.  See United States v. Sanchez, 89 F.3d at 719 (concluding that an officer's search of a suspect's car was valid when the suspect gave consent to search the car for weapons, but failed to object when the officer began to search the glove compartment and discovered narcotics).  Accordingly, in United States v. Gordon,

the Tenth Circuit found it "most significant[]" that Gordon did not object to a search of the locked bag when the officer discovered it within his larger bags.  173 F.3d at 766 (citing <u>Florida v. Jimeno</u>, 500 U.S. 248, 252 (1991)("A suspect may of course delimit as he chooses the scope of the search to which he consents.")).  The Tenth Circuit emphasized: "We consistently and repeatedly have held a defendant's failure to limit the scope of a general authorization to search, and failure to object when the search exceeds what he later claims was a more limited consent, is an indication the search was within the scope of consent."  173 F.3d at 766.

## <u>RELEVANT LAW REGARDING THE EXCLUSIONARY RULE</u>

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person.  <u>See</u> <u>Sanchez-Llamas v. Oregon</u>, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, <u>e.g.</u>, unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); <u>United States v. Calandra</u>, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment and a causal nexus between the violation and the evidence sought to be excluded.  <u>See</u> <u>United States v. Torres-Castro</u>, 470 F.3d 992, 999 (10th Cir.2006).  Once the defendant makes this showing, the burden shifts to the United States to prove that an exception to the exclusionary rule applies.  <u>See</u> <u>United States v. Torres-Castro</u>, 470 F.3d at 999. The Supreme Court has recognized several exceptions to the exclusionary

rule.  See United States v. Alabi, 943 F. Supp. 2d 1201, 1255 (D.N.M. 2013), aff'd, 597 F. App'x

991 (10th Cir. 2015).

One such exception is the attenuation doctrine: "Evidence is admissible when the

connection between unconstitutional police conduct and the evidence is remote or has been

interrupted by some intervening circumstance, so that 'the interest protected by the constitutional

guarantee that has been violated would not be served by suppression of the evidence obtained.'"

Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)(quoting Hudson v. Michigan, 547 U.S. 586, 593

(2006)).  "The attenuation doctrine evaluates the causal link between the government's unlawful

act and the discovery of evidence."  Utah v. Strieff, 136 S. Ct. at 2061.  To determine whether

there are sufficient intervening acts to break the causal chain between the unlawful stop and the

discovery of evidence, courts examine the three factors that the Supreme Court articulated in

Brown v. Illinois, 422 U.S. 590 (1975).

First, the Court looks to the "temporal proximity" between the unconstitutional conduct

and the discovery of evidence to determine how closely the discovery of evidence followed the

unconstitutional search.  Brown v. Illinois, 422 U.S. at 603.  This factor often favors suppressing

the evidence unless "substantial time" elapses between an unlawful act and the time the evidence

is obtained.  Kaupp v. Texas, 538 U.S. 626, 633 (2003)(per curiam).  The Supreme Court has

previously concluded that a time span of "less than two hours" between the unconstitutional arrest

and the confession was too short an interval, and, therefore, counseled in favor of suppressing the

evidence.  Brown v. Illinois, 422 U.S. at 604.

Second, the Court considers "the presence of intervening circumstances."  Brown v.

Illinois, 422 U.S. at 603-04.  The Supreme Court found sufficient intervening circumstances to

admit the evidence in Segura v. United States, 468 U.S. 796 (1984), where it applied the

independent source doctrine.  See 468 U.S. at 799-801, 814.  There, agents had probable cause to believe that apartment occupants were dealing cocaine.  See 468 U.S. at 799-800.  They sought a warrant.  See 468 U.S. at 799-800.  In the meantime, they entered the apartment, arrested the occupant, and discovered evidence of drug activity during their security sweep.  See 468 U.S. at 800-01.  The next evening, they obtained a search warrant.  See 468 U.S. at 800-01.  The Supreme Court deemed the evidence admissible, notwithstanding the illegal search, because the information supporting the warrant was "wholly unconnected with the entry and was known to the agents well before the initial entry."  468 U.S. at 814.  The Supreme Court suggested that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'"  Utah v. Strieff, 136 S. Ct. at 2062 (quoting Segura v. United States, 468 U.S. at 815).

Third, and "particularly" significant under the Supreme Court's analysis, the Supreme Court examines "the purpose and flagrancy of the official misconduct."  Brown v. Illinois, 422 U.S. at 604.  See Utah v. Strieff, 136 S. Ct. at 2062 (observing that the third factor is particularly significant).  The exclusionary rule exists to deter police misconduct.  See Davis v. United States, 564 U.S. 229, 236-37 (2011).  The third factor reflects this rationale by favoring exclusion "only when the police misconduct is most in need of deterrence -- that is, when it is purposeful or flagrant."  Utah v. Strieff, 136 S. Ct. at 2063.  Mere negligence in violating the Fourth Amendment "hardly rise[s] to a purposeful or flagrant violation."  Utah v. Strieff, 136 S. Ct. at 2063.  See United States v. Ramos, 194 F. Supp. 3d 1134, 1185-87 (D.N.M. 2016)(Browning, J.);

## LAW REGARDING THE INEVITABLE-DISCOVERY EXCEPTION TO THE EXCLUSIONARY RULE

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  782 F.2d at 152.  Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it."  810 F. Supp. 2d at 1274 (citations and internal quotation marks omitted).  On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question.  See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explained:

> In Cunningham and [United States v. Souza, 223 F.3d 1197 (10th Cir. 2000),] we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal."  Cunningham, 413 F.3d at 1204 n.1.  In Cunningham, police searched the defendant's home after getting his consent.  Id. at 1202.  The defendant later contested the search, claiming his consent was coerced.  Id.  We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred.  Id. at 1205.  In Souza, police illegally opened a UPS

package that contained drugs.  223 F.3d at 1200, 1202.  We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred.  *Id.* at 1206.  Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.

. . . .

Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] *Larsen*, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203.  The Tenth Circuit stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means."  United States v. Souza, 223 F.3d at 1205. The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)).  Applying the first factor, the Tenth Circuit stated:

[T]he prerequisite to a consideration of the inevitable discovery exception in these cases, steps taken to obtain a warrant prior to the unlawful search, is present in this case. Special Agent Rowden took steps to alert his office that he would be coming back to prepare a warrant for the package and made sure that the affidavit form would be ready when he got back to his office. Also, the package was specifically placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205. Regarding the second factor, the Tenth Circuit stated:

[A]t the time the illegal search occurred, probable cause to believe the package contained contraband was extremely strong. The package itself contained several suspicious characteristics, including all of the openings on the box being heavily taped, the box having been sent through third party shipping, the sender having only used a first name, and the box being solid so that no side of it could be compressed. Moreover, the box was alerted to by a certified narcotics dog, which is itself sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06. The Tenth Circuit noted that a sergeant eventually obtained a search warrant. See United States v. Souza, 223 F.3d at 1206. Regarding the third factor, the Tenth Circuit stated that, unlike "Cabassa, there is no question . . . concerning the inevitability of discovery of the evidence if the police had obtained a search warrant because the package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued." United States v. Souza, 223 F.3d at 1206. The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53 (internal quotation marks omitted)(quoting

United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)).  The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  See United States v. Owens, 782 F.2d at 152-53.  Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concluded:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable.  The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband.  Alternatively, a friend could have returned to claim the closed bag.

782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation."  United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.).

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the warrant to search his house would have been issued and the incriminating evidence would have been discovered."  413 F.3d at 1205.  The Tenth Circuit, in addressing the first factor -- the extent

to which the warrant process had been completed at the time those seeking the warrant learn of the

search -- stated:

> Here, the officers took substantial steps to obtain a warrant before the contested search occurred.  The record demonstrates that they had focused their investigation on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search warrant for one of these homes.  As a result of their conversation with the [assistant United States attorney], the officers decided that further surveillance on the two homes was necessary before they specifically selected one to search, and they proceeded to conduct that surveillance immediately.  The officers' actions clearly indicate they took steps to obtain a search warrant and that they intended to obtain the warrant for either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204.  Regarding the second factor -- the strength of the showing of probable cause at

the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179 East 76th Terrace by the time Mr. Cunningham arrived at the home.  Prior to that time, they had acquired background information about the alleged check-writing ring, narrowed their investigation to one residential block, and focused on the two homes sharing a common driveway.  The officers' surveillance had uncovered the following additional information: a red car containing two individuals identified earlier in the investigation arrived, parked briefly, and then pulled out from behind 1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace.  The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05.  Regarding the third factor -- whether a warrant

ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the

officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside

Mr. Cunningham's home."  413 F.3d at 1205.  Regarding the fourth factor -- evidence that the

officers "jumped the gun," because they lacked confidence in their showing of probable cause and

wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

> There is also no evidence the officers "jumped the gun" due to a lack of confidence
> about probable cause and out of a desire to force the issue.  [United States v. Souza,
> 223 F.3d] at 1204.  Instead, the record indicates that the search occurred at the time
> it did because of the coincidental arrival of Mrs. Cunningham.  Her presence on the
> scene led to a series of events that culminated in her son's release from jail, his
> return home, and his consent to search.  As a result, we are satisfied the government
> has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East
> 76th Terrace on the evening of the search, the officers would have obtained a search
> warrant and the evidence in question would have been found.  *Id.* at 1205.

United States v. Cunningham, 413 F.3d at 1205 (citations omitted).  The Tenth Circuit, therefore,

applied the inevitable-discovery doctrine.  See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and

determined that the inevitable-discovery exception applied.  See 810 F. Supp. 2d at 1275-79.

Regarding the first factor -- the extent to which the warrant process had been completed at the time

those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any

steps to obtain a warrant before entering Christy's residence.  The United States concedes that they

did not attempt to obtain a warrant before entering Christy's residence. . . .  This factor thus weighs

against applying the inevitable discovery exception."  810 F. Supp. 2d at 1275 (citations omitted).

As to the second factor -- the strength of the showing of probable cause at the time the search

occurred -- the Court concluded:

> The Court finds that Carvo had strong probable cause that Christy
> committed crimes.  At the time of the search, Carvo believed he had probable cause
> for the California crime of unlawful sexual intercourse, because Christy and K.Y.
> exchanged naked pictures through electronic mail transmissions over the internet
> and then arranged a meeting in the middle of the night for K.Y. to run away with
> Christy.
>
> . . . .

. . . . Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable." These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse. Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the California crime of unlawful sexual intercourse.

Carvo also had strong probable cause for the federal crime of coercion or enticement. Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

. . . .

. . . . Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," Maryland v. Pringle, 540 U.S. 366, 371 . . . (2003)(citation omitted), for the federal crime of coercion or enticement. Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1276-78 (brackets in original)(citations to record and

footnote omitted). Regarding the third factor, -- whether a warrant ultimately was obtained, albeit

after the illegal entry -- the Court held:

The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy. *United States v. Cunningham*, 413 F.3d at 1205. Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation. Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so. Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the BCSO

- 61 -

or from the Albuquerque FBI. Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information. Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature." If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant. Carvo is cross designated to acquire both state and federal search warrants. This factor thus weighs in favor of application of the inevitable-discovery doctrine.

United States v. Christy, 810 F. Supp. at 1278-79 (second and third alterations in original)(citations omitted). As to the fourth factor -- the existence of evidence that the officers jumped the gun, because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue." *United States v. Cunningham*, 413 F.3d at 1205. The record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter Christy's residence. This factor thus weighs in favor of application of the inevitable discovery doctrine.

United States v. Christy, 810 F. Supp. 2d at 1279. Consequently, the Court applied the inevitable-discovery doctrine. See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision. See 739 F.3d at 539-44. Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant challenged the Court's ruling only on factors two and four -- the strength of the probable cause showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep the warrant requirement." United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)). Regarding

the second factor -- the strength of the showing of probable cause at the time the unlawful search

occurred -- the Tenth Circuit stated:

> The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y. Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y. Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy. Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable. Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law. The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted). Analyzing the fourth factor --

evidence that the officers jumped the gun because they lacked confidence in their showing of

probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit

explained:

> Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. Instead, the deputies forced entry because they believed K.Y. was in danger. Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted). The Tenth Circuit concluded,

therefore, that the Court properly applied the United States v. Souza factors. See 739 F.3d at 542.

## **ANALYSIS**

Carter did not violate Alderete's Fourth Amendment rights when he opened the driver's

seat door of Alderete's vehicle to obtain the VIN on the doorjamb and subsequently saw what

appeared to be a firearm in Alderete's vehicle. Because of the sun's glare, Carter could not read

the VIN on Alderete's windshield, so he obtained the VIN from the driver's seat doorjamb without physically entering the vehicle.  As the Supreme Court and the Court have held, neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- "is subject to a reasonable expectation of privacy."  New York v. Class, 475 U.S. at 118.  Even if Carter had not opened the driver's seat door and seen the firearm, the APD officers had probable cause and were very likely to seek a search warrant for Alderete's vehicle.  The Court concludes, however, that the United States has not established a high level of confidence that, absent the VIN inspection, a warrant inevitably would have been issued and the firearm obtained.  Thus, if the VIN inspection were unlawful, then the United States could not prevent suppression under the inevitable discovery doctrine.  Because the Court concludes that the VIN inspection was constitutionally sound, the Court denies the requests in the Motion and will not suppress the evidence of the firearms discovered in Alderete's vehicle.

## I.   CARTER'S VIN INSPECTION DOES NOT VIOLATE THE FOURTH AMENDMENT.

The Court concludes that Carter's VIN inspection does not violate the Fourth Amendment. Alderete argues that Carter's "opening the door purportedly to view the VIN was a violation of Mr. Alderete's reasonable expectation of privacy."  Tr. at 49:13-16 (Gagan).  Alderete contends that nothing blocked Carter's view of the VIN on his dashboard.  See Tr. at 52:18-21 (Gagan). According to Alderete, the Tenth Circuit has "limit[ed] the permissible scope of police intrusions aimed at checking a vehicle's VIN."  Tr. at 51:23-24 (Gagan).  Alderete further argues that the United States' contention that the VIN was difficult to read is "evidence that law enforcement wanted access to the passenger compartment of the vehicle as 'a ruse for a general rummaging in

order to discover incriminating evidence.'"  Motion at 9 (quoting United States v. James, 406 F. Supp. 3d at 1041).

Carter's VIN inspection did not violate Alderete's reasonable expectation of privacy.  The Supreme Court has held that VIN searches are "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN." New York v. Class, 475 U.S. at 119.  See id. at 114 ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile.").  Unlike checking license and insurance, however, checking the VIN located inside of the vehicle's doorjamb requires opening the vehicle's door.  Nevertheless, the Supreme Court has stated that neither of the VIN's two locations -- "either inside the doorjamb, or atop the dashboard and thus ordinarily in plain view of someone outside the automobile" -- "is subject to a reasonable expectation of privacy." New York v. Class, 475 U.S. at 118.

In New York v. Class, the officer checked both the VIN on the defendant's doorjamb and on the defendant's windshield.  See 475 U.S. at 118-19.  The Supreme Court noted that officers cannot "enter a vehicle to obtain a dashboard-mounted VIN when the VIN is visible from outside the automobile." 475 U.S. at 119.  By "entering a vehicle," the Supreme Court was not referencing opening the door to view the VIN located on the doorjamb.  475 U.S. at 119.  Rather, the Supreme Court was referencing the officer's actions in that case: reaching into the passenger compartment and moving items inside of the vehicle.  See 475 U.S. at 118-19.  The Supreme Court made clear that it did not consider the officer's checking the doorjamb VIN to be an intrusion into the vehicle's interior.  See 475 U.S. at 118 ("He did not even intrude into the interior at all until after he had checked the doorjamb for the VIN." (emphasis added)).  It observed that "officers were entitled to

- 65 -

[check the VIN] as part of an undoubtedly justified traffic stop." 475 U.S. at 119. Consequently, Carter was authorized to examine, not only the windshield VIN, but also the doorjamb VIN.

Alderete argues that the Tenth Circuit has "limit[ed] the permissible scope of police intrusions aimed at checking a vehicle's VIN." Tr. at 51:23-24 (Gagan). According to Alderete, in United States v. Caro and United States v. Miller, the Tenth Circuit held that "if the VIN is visible from outside the vehicle the officer cannot enter the vehicle to read it." Tr. at 53:12-14 (Gagan). The Court disagrees with Alderete's interpretation of the Tenth Circuit's caselaw. As the Tenth Circuit has explained:

> In *Caro*, we held that "where the dashboard VIN plate is readable from outside the passenger compartment, that VIN matches the VIN listed on the registration, and there are no signs the plate has been tampered with, there is insufficient cause for an officer to extend the scope of a detention *by entering a vehicle's passenger compartment* for the purpose of further examining any VIN." 248 F.3d at 1246 (emphasis added). In light of this holding and the Supreme Court's reasoning in *Class*, we believe it is clear that *Caro* applies only when (1) the officer has verified the dashboard or doorjamb VIN from outside the passenger compartment and (2) the officer nevertheless physically enters the passenger compartment to check the VIN. There is no unlawful detention under *Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both.

United States v. Chavira, 467 F.3d at 1289 n.1 (emphasis in original)(alterations added).[8]  Here, the APD officers did not verify the VIN on the dashboard, because the sun's glare on the

---

[8]The Court disagrees with the Supreme Court's and the Tenth Circuit's VIN jurisprudence. Justice Ginsburg stated in Rodriguez v. United States, 575 U.S. 348 (2015), that a traffic stop "may last no longer than is necessary to effectuate th[e stop's] purpose." 575 U.S. at 354 (internal quotation marks omitted). This statement is rooted in prior cases such as Florida v. Royer, 460 U.S. 491, 500 (1983), and Illinois v. Caballes, 543 U.S. 405, 407 (2005). Although the Supreme Court and the Tenth Circuit have held that: (i) a police officer can detain a motorist only as long as necessary to complete the tasks that justified the stop; and (ii) as a general principle, a Terry[v. Ohio, 392 U.S. 1 (1968)("Terry")] stop cannot exceed the scope of the stop's reason, see Rodriguez v. United States, 575 U.S. 353-54, the Supreme Court and the Tenth Circuit over the years have added incrementally a plethora of permissible tasks, including VIN inspections, that a police officer may perform within the stop context. Jurisprudential tension exists, because, on the one hand, officers must take no more time than necessary to perform tasks related to the stop, but, on

_____

the other hand, the tasks related to the stop are innumerable.  In effect, the rule of "no longer than [] necessary" has been butchered beyond recognition.  Rodriguez v. United States, 575 U.S. at 354.

For example, if a patrol officer stops a motorist for speeding, it is unclear why the patrol officer can ask to see the motorist's registration or insurance card.  If the patrol officer only has probable cause to investigate the speeding infraction, the patrol officer must, when examining the registration and insurance, be investigating whether the motorist violated any other traffic code provisions, such as those that require a motorist to have a valid driver's license and automobile insurance.  The same is true for VIN inspections.  If a patrol officer pulls a motorist over for following another vehicle too closely, the VIN -- a static number -- provides no information related to the distance between two vehicles.  The only reason a patrol officer would examine a VIN is to detect whether the vehicle is stolen.  Whether a patrol officer checks a motorist's license and registration, or rubbernecks inside the driver's door to check the doorjamb VIN sticker, these actions take time and are unrelated to the investigation whether the motorist violated a speeding or following-too-closely statute.  Nevertheless, Rodriguez v. United States does not find that such actions extend the traffic stop longer than is necessary.  See 575 U.S. at 354.  In effect, Justice Ginsburg's limiting language in Rodriguez v. United States accomplishes little.

The Tenth Circuit has wrestled with the tension internal to Rodriguez v. United States multiple times in an attempt to pin down precisely what constitutes an unconstitutional extension of a traffic stop.  See, e.g., United States v. Williams, 271 F.3d 1262 (10th Cir. 2001); United States v. Holt, 229 F.3d 931 (10th Cir. 2000)("Holt I").  In an opinion later vacated on rehearing en banc, the Tenth Circuit questioned whether inquiries about a driver's travel plans relate to a stop's purpose.  See Holt I, 229 F.3d at 936.  The Tenth Circuit stated in its decision that "none of the [Tenth Circuit's previous] decisions explore or explain why it is constitutionally permissible for an officer to ask [a] detainee about his or her travel plans if the questioning is unrelated to the purpose of the stop."  Holt I, 229 F.3d at 936 (citing United States v. Kopp, 45 F.3d 1450, 1454 (10th Cir. 1995)(acknowledging that officer asked detainee questions about his travel plans); United States v. McSwain, 29 F.3d 558, 561 (10th Cir. 1994)(stating that "an officer conducting a routine traffic stop may inquire about 'identity and travel plans'")(quoting United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989)); United States v. Rivera, 867 F.2d at 1263 (holding that it was permissible for an officer to "ask questions relating to . . . identity and travel plans")).  The Tenth Circuit nevertheless distinguished its former decisions allowing travel-related questions and the case at issue, where the officer questioned whether the motorist's vehicle contained loaded weapons, and the Tenth Circuit appears to have segregated travel-related questions in a different category.  See 229 F.3d at 936.  After a rehearing en banc, the Tenth Circuit vacated the decision.  See United States v. Holt, 264 F.3d 1215, 1217-18 (10th Cir. 2001)(en banc), vacating 229 F.3d 931 ("Holt II").

In later describing Holt II, the Tenth Circuit reaffirmed its prior notion that travel-related questions are within a traffic stop's scope.  See United States v. Williams, 271 F.3d at 1267.  It contradicted Holt I's assertion that the Tenth Circuit had not directly addressed the issue, stating:

> When directly confronted with the issue, we have repeatedly held (as have other circuits) that questions relating to a driver's travel plans ordinarily fall within the scope of a traffic stop.  *See* [United States v.] West, 219 F.3d [1171,] 1176 [(10th Cir. 2000)](stating that "questions about travel plans are routine and 'may be asked

_____

as a matter of course without exceeding the proper scope of a traffic stop'")(quoting *United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996)); *see also United States v. Santana-Garcia*, 264 F.3d 1188, 1192-93 (10th Cir. 2001)(quoting *West*, 219 F.3d at 1176); *United States v. Rivera*, 867 F.2d 1261, 1263 (10th Cir. 1989); *United States v. Hill*, 195 F.3d 258, 268 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 . . . (2000); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999), *cert. denied*, 528 U.S. 1161 . . . (2000). Though such questions do typically fall within the scope of a traffic stop, citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions. *See United States v. $404,905.00*, 182 F.3d at 647 n.2 (citing *Terry*, 392 U.S. at 34 [ . . . ](White, J., concurring)). In addition, a motorist's refusal to answer routine questions may not furnish a basis for arrest, "although it may alert the officer to the need for continued observation." *Terry*, 392 U.S. at 34 [ . . . ](White, J., concurring).

United States v. Williams, 271 F.3d at 1267 (emphasis added)(alterations added). After clarifying that travel-related questions are within a traffic stop's scope, the Tenth Circuit concluded that "the officer's questioning regarding [the motorist's] travel plans was within the scope of the traffic stop." 271 F.3d at 1267.

The Court believes that many of the tasks that the Supreme Court and the Tenth Circuit allow are inconsistent with the Constitution and that the federal courts should be cautious about allowing too many unnecessary tasks. The Court would hold that officers should take no longer than necessary to investigate the particular reason for a given traffic stop unless: (i) the patrol officer has reasonable suspicion or probable cause to investigate other crimes; or (ii) the motorist consents. The Court would be hard-pressed to conclude that a patrol officer routinely should be permitted to check a motorist's registration and insurance, inspect a stopped vehicle's VIN, or barrage a motorist with travel-related questions after writing a ticket or handing back papers, without reasonable suspicion or consent. A traffic stop should not be an excuse to investigate every possible crime in the American corpus juris.

At the oral argument for Rodriguez v. United States, the Honorable Antonin Scalia, then-Associate Justice of the Supreme Court, also questioned why checking a driver's license, asking travel-related questions, and determining whether a car is stolen "are embraced within the mission [of a traffic stop for a broken taillight] when the only basis for the stop is you have a broken taillight." Transcript of Oral Argument at 9, Rodriguez v. United States, 575 U.S. 348 (No. 13-9972)("Rodriguez Tr."); id. at 10 ("It's a broken taillight. That's the only thing that comes within the traffic stop. All the rest is added on."). The Honorable Samuel Alito, Associate Justice of the Supreme Court, similarly asked why "adding any time to the stop in order to do a records check is part of the mission but the dog sniff is not." Rodriguez Tr. at 21. Justice Scalia concluded that courts are "willing to expand the mission to everything up to but not beyond the dog sniff." Rodriguez Tr. at 10.

The Supreme Court ultimately held, regarding "whether the Fourth Amendment tolerates a dog sniff conducted after completion of a traffic stop," Rodriguez v. United States, 575 U.S. at 350, that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by

windshield made it difficult to see the VIN on the dashboard.  See FOF ¶ 33, at 9; Carter Lapel Video at 20:20-20:32.  Nothing covered the VIN on Alderete's dashboard, see FOF ¶ 34, at 9; Tr. at 52:18-21 (Gagan), and Alderete argues that the APD officers' contention that the VIN was difficult to read is "evidence that law enforcement wanted access to the passenger compartment of the vehicle as 'a ruse for a general rummaging in order to discover incriminating evidence,'" Motion at 9 (quoting United States v. James, 406 F. Supp. 3d at 1041).  The Court has viewed the Carter Lapel Video and concludes, however, that Carter did not enter or step inside of Alderete's vehicle to obtain the VIN.  See FOF ¶ 38, at 9; Carter Lapel Video at 20:30-20:55.  Carter opened the driver's seat door, bent over to look at the VIN, and took approximately fifteen seconds to write the VIN in a small spiral notebook.  See FOFs ¶¶ 36-37, at 9; Carter Lapel Video at 20:30-20:55.  For the entire duration of the VIN inspection, Carter did not physically step into the vehicle. See FOF ¶ 38, at 9; Carter Lapel Video at 20:30-20:55.  Thus, there is no sound factual basis for inferring that Carter engaged in "a general rummaging in order to discover incriminating evidence."  United States v. James, 406 F. Supp. 3d at 1041.  Rather, Carter remained outside Alderete's vehicle while obtaining the doorjamb VIN, and, under current Tenth Circuit caselaw,

---

a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." Rodriguez v. United States, 575 U.S. at 350 (internal quotation marks omitted)(alterations in original).  Justice Alito noted in dissent, however, that such a rule "is unlikely to have any appreciable effect on the length of future traffic stops.  Most officers will learn the prescribed sequence of events even if they cannot fathom the reason for that requirement."  Rodriguez v. United States, 575 U.S. at 372 (Alito, J., dissenting).

  The Court shares Justice Scalia's and Justice Alito's skepticism toward the current state of the law on this issue, convinced that the police should accomplish the narrow task set related to the stop and let the driver go, rather than using a traffic stop to investigate for more crimes, unless there is reasonable suspicion or consent.  The Court is, however, a district court, and Supreme Court and Tenth Circuit precedent binds it.  Even if the Court wishes that Justice Ginsburg's statement that a stop "may last no longer than is necessary to effectuate th[e stop's] purpose," 575 U.S. at 354, had more teeth, the Court cannot ignore Supreme Court and Tenth Circuit cases.

"[t]here is no unlawful detention . . . if the officer remains physically outside the car when he examines the VIN." United States v. Chavira, 467 F.3d at 1289 n.1.

Finally, Alderete argues that Carter's VIN inspection violated his Fourth Amendment rights, because he was not stopped for a traffic violation on a public roadway and because the APD officers had no reason to investigate his vehicle in relation to any crime. See Tr. at 52:6-13 (Gagan). Alderete argues that the APD officers "had no reason to suspect [that his] vehicle was stolen because there were no specific articulable facts demonstrating such." Motion at 7. Alderete notes that the Tenth Circuit has held that "'[a] driver *who has committed a traffic violation* does not have a reasonable expectation of privacy in his vehicle's VIN, even if it is not in plain view,'" and that he had a reasonable expectation of privacy in his vehicle's VIN, because he did not commit a traffic violation. Motion at 7 (quoting United States v. Miller, 84 F.3d at 1251, and citing New York v. Class, 475 U.S. at 113-14)(emphasis in Motion but not in United States v. Miller). The United States counters that there is "no distinction" in the caselaw between obtaining a VIN "in the context of a traffic stop, and in the context of any other type of police investigation." Tr. at 73:8-11 (Outler). At the hearing, the Court said that it will "have to think a little bit about [whether] this [case] is analogous to a traffic stop." Tr. at 81:19-24 (Court).

The hallmark of the Fourth Amendment is reasonableness. See United States v. McHugh, 639 F.3d at 1260 ("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. at 403); United States v. Harmon, 785 F. Supp. 2d at 1157. To determine whether a search is "reasonable" under the Fourth Amendment, courts must "'examin[e] the totality of the circumstances.'" Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118)(alteration in Samson v. California and not in United States v. Knights). For example, a "traffic stop is a seizure within the

meaning of the Fourth Amendment[, but] it is characterized as an investigative detention, which requires reasonable suspicion of criminal activity before a seizure can be made, rather than a full custodial arrest, which requires probable cause."  United States v. Toro-Pelaez, 107 F.3d at 823-24.  Moreover, the Supreme Court has recognized that the "Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 654 (quoting New Jersey v. T.L.O., 649 U.S. at 338).  Thus, an "illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched."  United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995).

Police officers may stop a vehicle only when they have "a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity."  United States v. Elkins, 70 F.3d at 83 (citing United States v. Nicholson, 983 F.2d at 987).  Accord United States v. Ramos, 194 F. Supp. 3d at 1156.  No one factor determines reasonable suspicion; rather, the totality of the circumstances that the officer knew determines reasonableness.  See United States v. Ceballos, 355 F. App'x at 229; United State v. Elkins, 70 F.3d at 83 (citing Alabama v. White, 496 U.S. at 330).  Even if the officer does not form subjective reasonable suspicion, if the circumstances of which he is aware would lead an officer to develop reasonable suspicion, the stop is proper.  See United States v. Ceballos, 355 F. App'x at 229.

The Court concludes that, under controlling Tenth Circuit caselaw, Alderete has no reasonable expectation of privacy in his vehicle's doorjamb VIN, and thus Carter's VIN inspection was constitutional.  Alderete argues, however, that "'[a] driver *who has committed a traffic violation* does not have a reasonable expectation of privacy in his vehicle's VIN, even if it is not in plain view.'"  Motion at 7 (quoting United States v. Miller, 84 F.3d at 1251, and citing New York v. Class, 475 U.S. at 113-14)(emphasis in Motion but not in United States v. Miller).  Thus,

Alderete argues that a VIN inspection's constitutionality depends on the reason for the initial stop. See Motion at 7.

While the Court is sympathetic to Alderete's attempt to limit the Supreme Court's and Tenth Circuit's expansion of what police can do to obtain VINs, the Court does not believe that the Supreme Court and Tenth Circuit would adopt the formalistic distinction that Alderete posits, for two reasons.  First, more recent Tenth Circuit caselaw lacks United States v. Miller's limiting language, which indicates that a traffic violation is not a necessary pre-requisite for a VIN inspection.  For example, as discussed above, the Tenth Circuit reasoned in United States v. Chavira that both VIN locations -- the dashboard and the doorjamb -- are visible to someone outside the vehicle, and, thus, neither location is "subject to a reasonable expectation of privacy." 467 F.3d at 1289 n.1.  The Tenth Circuit did not predicate a VIN inspection's reasonableness on the reason for the initial stop, i.e., a traffic violation.  Rather, the Tenth Circuit emphasized that "[t]here is no unlawful detention under [United States v. ]*Caro* if the officer remains physically outside the car when he examines the VIN on the dashboard, the doorjamb, or both."  467 F.3d at 1289 n.1.[9]  Next, in United States v. Malady, 209 F. App'x 848, 851 (10th Cir. 2006)(unpublished),

---

[9]The Court notes that legal scholars and other courts also have criticized the Supreme Court's conflation of dashboard VINs -- which are fully visible without opening a vehicle's door or entering the vehicle -- and VINs located in more secluded locations.  See, e.g., Tracey Maclin, New York v. Class: A Little-Noticed Case with Disturbing Implications, 78 J. Crim. L. & Criminology 1, 24 (1987); State v. Blake, 2004 UT 95, ¶¶ 28-29, 103 P.3d 699, 705-06.  For example, Professor Tracey Maclin at Boston University School of Law has argued:

> The Court's analysis is unconvincing . . . .  In its haste to find that a motorist has no expectation of privacy in the VIN, the Court failed to distinguish between the degree of privacy one can expect with regard to the VIN and the degree of privacy one has in the particular area in which the VIN is located.  Justice O'Connor did not recognize that the degree of privacy one has in an identification number is wholly different from the degree of privacy one can reasonably expect in the portion of the vehicle which must be transversed in order to examine the VIN.

the Tenth Circuit relied on United States v. Miller and held that, "if 'the VIN on the dashboard is

covered and the driver is not in the vehicle, the officer may open the door to read the VIN on the

doorjamb . . . or he may reach into the vehicle to remove any obstruction covering the VIN on the

dashboard.'"   United States v. Malady, 209 F. App'x at 851 (quoting United States v. Miller, 84

F.3d at 1251).   The Tenth Circuit did not suggest that a VIN inspection is justified only if a

defendant commits a traffic violation.   Instead, the Tenth Circuit justified VIN inspections by

emphasizing VINs' role in the regulation of automobiles.   See United States v. Malady, 209 F.

App'x at 851 (noting that "the Supreme Court has held that there is 'no reasonable expectation of

privacy in the VIN' of a vehicle, given the 'important role played by the VIN in the pervasive

governmental regulation of the automobile and the efforts by the Federal Government to ensure

that the VIN is placed in plain view" (quoting New York v. Class, 475 U.S. at 113-14)).   Here,

---

Maclin, 78 J. Crim. L. & Criminology at 24.   Similarly, in State v. Blake, the Supreme Court of
Utah heavily criticized New York v. Class:

> The factual setting and structure of the plurality opinion in Class strongly
> point to a result-driven outcome.   The discovered firearm was an indisputable safety
> risk.   With the benefit of hindsight, it would have been nonsensical to allow the
> driver to return to the car to move the papers obscuring the VIN and thereby placing
> him within reach of his weapon.   Bowing to this reality, the Court anchored itself,
> albeit tenuously, to the purpose and positioning of the VIN and erected its
> precarious scaffolding of justifying factors.   By the time it reached the gun, the
> Court's reasoning had become highly cantilevered and barely able to support the
> weight of its outcome.   It is not an architecture easily transferred to other factual
> environments.

> Indeed, were we to adopt Class under the facts in this case, it would be
> difficult to imagine any circumstance where a police officer would not be justified
> in searching a car's interior since it would always be safer for an officer to search
> the car herself than to ask for non-visible information, such as a driver's license.

2004 UT 95, ¶¶ 28-29, 103 P.3d at 705-06.

Carter remained outside the vehicle throughout the entire duration of his VIN inspection when he saw a firearm in plain view near the driver's seat of Alderete's vehicle.  See FOF ¶ 38, at 9; Carter Lapel Video at 20:30-20:55.  Although nothing blocked Carter's view by covering the dashboard VIN, see FOF ¶ 34, at 9, the sun's glare made the VIN difficult to read, see FOF ¶ 33, at 9, and thus, the fact that Carter did not and could not read the dashboard further justifies his opening the driver's seat door to view the doorjamb VIN -- all without entering the vehicle, see FOF ¶ 38, at 9. See also United States v. Malady, 209 F. App'x at 851 ("Because the VIN was not visible and [the defendant] was not in the vehicle at the time, the officer was justified in opening the truck's door to locate the VIN.").

Second, the Court concludes that, like a traffic stop, the APD officers' stop of Alderete is analogous to a Terry stop, and thus the same standard that applies to Terry stops also applies here. See United States v. Gonzales, 535 F.3d 1174, 1181 (10th Cir. 2008)(noting that a "routine traffic stop is a relatively brief encounter and is more analogous to a so-called Terry stop . . . than to a formal arrest'" (quoting United States v. Callarman, 273 F.3d 1284, 1286 (10th Cir. 2001))).  "To justify a Terry stop the detaining officer must have, based on all the circumstances, a 'particularized and objective basis for suspecting' the person stopped of 'criminal activity.'" United States v. Winder, 557 F.3d 1129, 1133 (10th Cir. 2009)(quoting United States v. Cortez, 449 U.S. at 417-18).  The test for whether a Terry stop is two-fold: "First we ask whether the officer's action was justified at its inception.  If so, we then ask whether the resulting detention was reasonably related in scope to the circumstances that justified the stop in the first place." United States v. Valenzuela, 494 F.3d 886, 888 (10th Cir. 2007).

The Court concludes that stopping Alderete and having him exit his vehicle was justified at its inception.  It is worth noting that Alderete does not challenge his arrest.  See Tr. at 75:24-

76:1 (Court)(noting that Alderete is "not moving to suppress the arrest. . . .  [T]hey're moving to suppress the evidence, the gun itself").  When the APD officers told Alderete to exit his vehicle, the APD officers were responding to a 911 call alleging assault with a firearm by an individual in a vehicle whose description matched the vehicle that the APD officers found in the Family Dollar Store parking lot.  See FOFs ¶¶ 1, 2, 7, at 4-5.  As the APD officers approached the vehicle, they could see four cellular telephones, which reasonably caused them to suspect that the driver might be involved in drug trafficking.  See FOF ¶¶ 16-17, at 7.  Before asking Alderete to exit the vehicle, the APD officers: (i) ran a check of the vehicle's temporary tag, which indicated that the vehicle was registered to Alderete, see FOF ¶ 10, at 6; and (ii) ran Alderete's name and temporary tag number through police databases and discovered that there is an outstanding warrant for his arrest on an unrelated misdemeanor traffic violation, see FOF ¶¶ 11-12, at 6.  Based on these factual findings, the Court concludes that the APD officers had "a reasonable suspicion of illegal activity." United States v. Peters, 10 F.3d 1517, 1522 (10th Cir. 1993).  See id. ("According to Terry, when an officer observes 'unusual conduct which leads him reasonably to conclude . . . that criminal conduct may be afoot,' he may perform an investigation as long as 'nothing in the initial stages of the encounter serves to dispel' his fears and suspicions." (quoting Terry, 392 U.S. at 30)).

The primary issue is thus whether the stop satisfies the second prong of the Terry test, i.e., whether the stop, and subsequent VIN inspection, were "reasonably related in scope to the circumstances that justified the stop in the first place."  United States v. Valenzuela, 494 F.3d at 888.  "A seizure for a traffic violation justifies a police investigation of that violation," Rodriguez v. United States, 575 U.S. 348, 354 (2015), which includes "ordinary inquiries incident to stop," Illinois v. Caballes, 543 U.S. at 408.  Typically, these inquiries involve checking the driver's license, registration, and proof of insurance, as well as determining whether any outstanding

warrants for the driver exist.  See Delaware v. Prouse, 440 U.S. 648, 658-60 (1979).  These checks serve the same purpose as the traffic code: to ensure that vehicles on the road are operated safely and responsibly.  See Delaware v. Prouse, 440 U.S. at 658-59; 4 W. LaFave, Search and Seizure § 9.3(c), 507-517 (5th ed. 2012).  Similarly, a VIN inspection confirms that the driver can legally operate this particular vehicle -- because it is not stolen -- on the highway.  See New York v. Class, 475 U.S. at 115.  Moreover, as discussed above, the Supreme Court has held VIN searches "constitutionally permissible in light of the lack of a reasonable expectation of privacy in the VIN and the fact that the officers observed . . . traffic violations."  New York v. Class, 475 U.S. at 119.

Because the Court determines that the APD officers' stop of Alderete is analogous to a stop for a traffic violation and was reasonable at its inception, the Court concludes that the subsequent VIN inspection was also reasonable under the Fourth Amendment.  Carter testified that it is routine for APD officers to check VINs on vehicles with a temporary tag.  See FOF ¶ 32, at 9; Tr. at 33:9-15 (Gagan, Carter).  Although Alderete's shirt color and lack of visible tattoos did not match the 911 caller's description, see FOF ¶ 20, at 7, after Alderete exited the vehicle, the APD officers confirmed his identity and subsequently detained and then arrested him on his outstanding warrant, see FOF ¶¶ 19, 21-22, 28, at 7-8.  Based on the four cellular telephones and the 911 call, the APD officers reasonably suspected possible criminal activity, and the APD officers wanted to ensure that the vehicle was not stolen by checking that the vehicle's VIN matched its temporary tag registration.  See FOF ¶ 30, at 8; United States v. Villa-Chaparro, 115 F.3d 797, 802 (10th Cir. 1997)(holding that an officer was justified in checking the defendant's VIN, in part, "[b]ecause . . . soap crystals covered the [vehicle's] floorboard, [and thus] the possibility existed that Defendant had stolen the vehicle, was transporting narcotics, or both").  The Court determines that "'nothing in the initial states of the encounter serves to dispel' [the APD officers'] fears and

suspicions." United States v. Peters, 10 F.3d at 1522 (quoting Terry, 392 U.S. at 30).  Moreover, the APD officers wanted to ensure that the vehicle was not stolen, because it was located "in a high crime area known for stolen vehicles" and temporary tags are easy to replicate.  Incident Report at 3.  See FOF ¶¶ 30-31, at 8.[10]  Carter's VIN inspection lasted approximately fifteen seconds and Carter did not physically enter the vehicle to obtain the VIN.  See FOFs ¶¶ 37-38, at 9.  Based on these facts, the Court concludes that, under current, controlling Supreme Court and Tenth Circuit caselaw, the APD officers' stop of Alderete justified the subsequent VIN inspection, and thus the VIN inspection does not rise to the level of an unlawful warrantless search.  See ew York v. Class, 475 U.S. at 115-19; United States v. Valenzuela, 494 F.3d at 888.  Accordingly, the Court determines that the VIN inspection was reasonable under the Fourth Amendment and, consequently, does not provide an adequate basis for suppressing the firearm.

## II.   THE UNITED STATES HAS NOT ESTABLISHED A HIGH LEVEL OF CONFIDENCE THAT, IF THE VIN INSPECTION IS UNCONSTITUTIONAL, APD OFFICERS WOULD HAVE INEVITABLY DISCOVERED THE FIREARM.

The United States argues that the "inevitable discovery doctrine applies here, even if the Court were to find that Officer Carter's VIN inspection was an unlawful warrantless search." Response at 5.  According to the United States, the evidence found on Alderete's person and the four cellular telephones that APD officers saw in plain view in Alderete's car "inevitably would

---

[10]Although the APD officers provide no objective reasons to believe that Alderete's specific vehicle was stolen, in New York v. Class, the Supreme Court noted that the "police officers had no reason to suspect that [the defendant's] car was stolen" or "that it contained contraband," and yet the Supreme Court held that the officer's interior VIN inspection was constitutionally permissible.  475 U.S. at 108.  See James K. Roosa, Fourth Amendment Rights and Non-Consensual Vehicle Identification Number Inspections Occurring During Traffic Stops, 37 Case W. Res. L. Rev. 339, 342 (1986)(noting that the Supreme Court in New York v. Class "held it constitutionally permiss[i]ble for a police officer to enter a vehicle during a traffic stop to search for a VIN not visible from the outside without having to articulate any suspicion that the vehicle was stolen").

have led the APD officers to seek a search warrant for the car, even if no firearms had been seen therein." Response at 6. The United States argues that the "critical question" under the inevitable discovery doctrine is "whether there existed some 'investigation that inevitably would have led to the evidence.'" Response at 5 (quoting United States v. Larsen, 127 F.3d at 987). The United States contends that evidence that the government first discovers during an unconstitutional search is admissible if the government later discovers the evidence during a valid search. See Response at 5 (citing Murray v. United States, 487 U.S. at 542-44; United States v. Cunningham, 413 F.3d at 1203-05).

Alderete counters that, because the United States says that it would have obtained a warrant even if Carter had not opened the driver's seat door to find the VIN, the Court "must determine 'how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to the warrant.'" Reply at 2 (quoting United States v. Souza, 223 F.3d at 1204). Alderete argues that the United States has not satisfied the four factors in United States v. Souza for invoking the inevitable discovery doctrine to the warrant requirement. See Tr. at 61:10-15 (Gagan). First, Alderete asserts that APD officers waited "four days after the officer found the gun in plain view at the scene" to begin the warrant process, which is a "long" time under United States v. Souza. Tr. at 61:16-18 (Gagan). Second, Alderete argues that there was no probable cause to search the car. See Tr. at 61:25-62:1 (Gagan). Third, Alderete concedes that the government obtained a search warrant, but he notes that the search warrant was premised on evidence of firearms, and not on evidence of drug trafficking. See Tr. at 62:9-19 (Gagan). Fourth, Alderete argues that the APD officers "jumped the gun," because they did not have probable cause on the alleged assault and because Carter "testified that the car was not being investigated as implicated in a crime." Tr. at 63:8-9 (Gagan).

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'"  United States v. Christy, 739 F.3d at 540 (quoting Nix v. Williams, 467 U.S. at 444).  "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation."  United States v. Cunningham, 413 F.3d at 1203.  In United States v. Owens, the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question.  782 F.2d at 152.  The Tenth Circuit has stated that "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means."  United States v. Souza, 223 F.3d at 1205.

The United States argues that, even if the VIN inspection were unconstitutional, a warrant would have been issued and the APD officers would have obtained the firearms in Alderete's vehicle by lawful means.  See Response at 5-6.  The United States does not address, however, Alderete's argument that impounding his vehicle was unlawful.[11]  Alderete contends that, because

---

[11]The United States argues:

> Whether Defendant's car was properly subject to some form of warrantless search, however, and indeed whether Officer Carter's VIN inspection itself was a warrantless search, are not questions this Court need resolve.  Given the firearm assault allegations against Defendant, the four cell phones in plain view in his car, and the firearm ammunition, cash, and narcotics found on his person, the arresting APD officers had probable cause to seek, and would have sought, a search warrant for Defendant's car even if Officer Carter had not seen a firearm in the car.  All of the necessary incriminating evidence against Defendant either had already been discovered or inevitably would be discovered during the lawful warrant search.

Response at 4-5.  Alderete counters that the United States "does not address Mr. Alderete's claim the search is not legally valid as an impoundment and inventory, and thus must agree."  Reply at 1.

APD officers located his firearm "pursuant to impoundment and inventory," the "government bears the burden of proving that its impoundment of a vehicle and any ensuing inventory search satisfies the Fourth Amendment."  Motion at 4 (citing United States v. Sanders, 796 F.3d at 1244).

The Court notes that Alderete's characterization of the APD officers' actions is only half-right -- the APD officers impounded his vehicle, but they did not conduct an inventory search.  See Tr. at 69:2-4 (Outler)("[W]e are not making the argument that [the firearm] was found incident to an inventory.").  The APD officers obtained the firearms in Alderete's vehicle pursuant a warrant, see FOFs ¶¶ 56-57, at 12, and the United States argues that "the fact that the incriminating evidence was later seized during a lawful warrant search cures any constitutional issue," Response at 6 (citing Murray v. United States, 487 U.S. at 542-44).  The United States does not address whether the impoundment, which preceded obtaining and executing the search warrant, was lawful.[12]

Whether the impoundment was lawful is significant, because it affects the Court's "level of confidence that . . . the specific evidence in question would have been obtained by lawful means."  United States v. Souza, 223 F.3d at 1205 (emphasis added).  If the impoundment were unlawful, then the Court "may apply the inevitable discovery exception only" if the Court determines that the APD officers would have obtained the firearms without impounding the

---

Alderete also requests that the Court address his argument that his vehicle's impoundment and inventory were unlawful.  See Reply at 1.

[12]The Court notes that the "United States bears the burden of proving that the impoundment of a vehicle and any subsequent inventory search of that vehicle is reasonable under the Fourth Amendment."  United States v. James, 406 F. Supp. 3d 1025, 1040 (D.N.M. 2019)(Browning, J.)(citing United States v. Sanders, 796 F.3d at 1244; United States v. Taylor, 592 F.3d 1104, 1107 (10th Cir. 2010)).  The United States has not addressed the impoundment's constitutionality and thus has not satisfied its burden.  Because the Court determines that the impoundment's constitutionality is relevant to deciding whether to apply the inevitable-discovery exception, the Court analyzes below the impoundment's constitutionality based on the Court's factual findings.

vehicle.  United States v. Souza, 223 F.3d at 1205.  Had the APD officers not impounded Alderete's vehicle and simply waited for the search warrant to be issued, it is less probable that the APD officers would have lawfully obtained the firearms, because it is likely that a friend, family member, or someone else would have removed the firearms from Alderete's vehicle before a search warrant was issued.

The Court concludes that impounding Alderete's vehicle was unlawful.  "'[I]mpoundment of a vehicle located on private property that is neither obstructing traffic nor creating an imminent threat to public safety is constitutional only if justified by both a standardized policy and a reasonable, non-pretextual community-caretaking rationale.'"  United States v. James, 406 F. Supp. 3d at 1040 (quoting United States v. Sanders, 796 F.3d at 1248)(alteration in United States v. James but not in United States v. Sanders).  Similarly, "[g]ranting police discretion over whether to impound and inventory a vehicle is permissible so long as officers exercise that discretion according to standardized criteria, and not 'in bad faith or for the sole purpose of investigation.'"  United States v. Taylor, 592 F.3d 1104, 1108 (10th Cir. 2010)(quoting Colorado v. Bertine, 479 U.S. 367, 372, 374-75 (1987)).  In determining whether a legitimate, non-pretextual community-caretaking rationale supports an impoundment decision, the Tenth Circuit has directed courts to consider the following, non-exhaustive list of factors:

> (1) whether the vehicle is on public or private property; (2) if on private property, whether the property owner has been consulted; (3) whether an alternative to impoundment exists (especially another person capable of driving the vehicle); (4) whether the vehicle is implicated in a crime; and (5) whether the vehicle's owner and/or driver have consented to the impoundment.

United States v. Sanders, 796 F.3d at 1250.

As to United States v. Sanders' standardized policy requirement, the APD Procedural Orders, but not the Albuquerque City Code, justify the APD officers' impoundment.  APD

Procedural Orders authorize impounding vehicles when "the driver has been incapacitated, hospitalized, arrested, or when the vehicle cannot be released to a responsible party. Officers will not tow if the vehicle is parked at the driver's place of residence, or his/her registered address." APD Procedural Order § 2-48-2(B).  The APD officers arrested Alderete in the Family Dollar Store parking lot, and thus the APD Procedural Orders justified their impoundment.  The Albuquerque City Code, however, authorizes impoundment

> [w]hen a driver or person in control of a vehicle is lawfully taken into custody by a police officer and the person is unable to immediately provide for the custody or removal of the vehicle and the vehicle is left as described elsewhere in this division (A), or the location of the vehicle is such that a reasonable person would believe that its owner would desire its relocation or removal.

Motion at 5-6 (quoting Albuquerque City Code § 8-5-2-4(A)(7)).  Alderete notes that the circumstances described in § 8-5-2-4(A) include a vehicle that is "left unattended upon any bridge, viaduct or tunnel and [that] obstructs traffic," a vehicle that is "parked on a street or public way and [that] obstructs traffic," and a vehicle that is "illegally parked and blocking entrance to a private driveway or access to firefighting equipment."  Motion at 6 (citing Albuquerque City Code § 8-5-2-4(A)(1), (2), (4), (5)).  The APD officers did not determine whether someone else could remove the vehicle, the vehicle was not "left as described elsewhere in this division (A)," and a reasonable person would not believe that Alderete would want the APD officers to tow the vehicle. Albuquerque City Code § 8-5-2-4(A)(7).  Thus, the APD officer's impoundment does not comply with the Albuquerque City Code.

The Court concludes that a standardized policy justified the APD officers' impoundment of Alderete's vehicle.  Alderete argues that the decision to impound his vehicle must comply with APD Procedural Orders and the Albuquerque City Code.  See Motion at 5 (citing United States v. Barraza, 2016 WL 9777163, at *4).  In United States v. Barraza, the Honorable Martha Vázquez,

United States District Judge for the United States District Court for the District of New Mexico, analyzed the impoundment of the defendant's vehicle under both the APD Procedural Orders and the Albuquerque City Code, because the "United States concede[d] that the rationale for impoundment must comply with both the Albuquerque City Code and the Albuquerque Police Department's standard operating procedure [] for impoundment." United States v. Barraza, 2016 WL 9777163, at *4. Here, the United States has not made this concession. United States v. Sanders requires that "a standardized policy" justify impoundment. United States v. Sanders, 796 F.3d at 1248 (emphasis added). The Court determines that, because the APD officers impounded Alderete's vehicle pursuant to the APD Procedural Orders, their impoundment satisfies United States v. Sanders' standardized policy requirement.

The Court concludes, however, that the APD officers lacked "a reasonable, non-pretextual community-caretaking rationale" to justify the impoundment. United States v. Sanders, 796 F.3d at 1248. None of the factors in United States v. Sanders point in the United States' direction: (i) Alderete's vehicle was located on private property; (ii) the APD officers did not consult with Alderete about towing his vehicle; (iii) the APD officers did not ascertain whether an alternative to impoundment existed; (iv) the vehicle was not directly implicated in any crime; and (v) Alderete did not consent to the impoundment. See United States v. Sanders, 796 F.3d at 1250. In United States v. Sanders, the Tenth Circuit held that the impoundment in that case was unconstitutional, because "it was not guided by standardized criteria, and was not justified by a legitimate community-caretaking rationale." United States v. Sanders, 796 F.3d at 1243. The Tenth Circuit noted, however, that "either failure alone would be sufficient to establish unconstitutionality." United States v. Sanders, 796 F.3d at 1243 (emphasis added). The Court concludes that the APD

officers' impoundment does not satisfy United States v. Sanders' community-caretaking rationale requirement, and thus the impoundment was unconstitutional.

Having determined that the impoundment was unconstitutional, the Court now turns to the inevitable-discovery exception's application.  As discussed above, "a court may apply the inevitable discovery exception only when it has a high level of confidence that the warrant in fact would have been issued and that the specific evidence in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205.  In this analysis, the impoundment would not constitute "lawful means," and thus the question becomes whether the Court has a "high level of confidence" that the APD officers would have obtained the firearms in Alderete's vehicle without conducting the VIN inspection and without impounding the vehicle.  United States v. Souza, 223 F.3d at 1205.

The Court concludes that the inevitable-discovery exception does not apply, because, although the APD officers were likely to receive a search warrant, the Court is not confident that the APD officers would have obtained the firearms.  The Tenth Circuit has adopted four factors to determine "how likely it is that a warrant would have been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62 F.3d at 473-74).  The first factor counsels against applying the inevitable-discovery exception, because there is no evidence that the APD officers had started the warrant process before the VIN

inspection or the impoundment occurred.  In contrast, in United States v. Cunningham, the Tenth

Circuit determined that the

> officers took substantial steps to obtain a warrant before the contested search
> occurred.  The record demonstrates that they had focused their investigation on
> 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search
> warrant for one of these homes. . . .  The officers' actions clearly indicate they took
> steps to obtain a search warrant and that they intended to obtain the warrant for
> either 1175 or 1179 East 76th Terrace as soon as possible.

413 F.3d at 1204 (emphasis added).  Here, there is no evidence that the APD "officers took

substantial steps to obtain a warrant before the contested search" -- the VIN inspection -- occurred.

United States v. Cunningham, 413 F.3d at 1204.  Instead, the APD officers waited "four days after

the officer found the gun in plain view at the scene" to begin the warrant process.  Tr. at 61:16-18

(Gagan).  See FOF ¶ 56, at 12.

The second factor also weighs in Alderete's favor, because the APD officers did not have

probable cause to search Alderete's vehicle at the time of the VIN inspection.  In contrast, in United

States v. Christy, the Court determined that the officer "had strong probable cause that [the

defendant] committed crimes."  United States v. Christy, 810 F. Supp. 2d at 1276.  The Court noted

that, at the time that the officer searched the defendant's residence without a warrant, the officer

"believed he had probable cause for the California crime of unlawful sexual intercourse, because

[the defendant] and K.Y. exchanged naked pictures through electronic mail transmissions over the

internet and then arranged a meeting in the middle of the night for K.Y. to run away with [the

defendant]."  United States v. Christy, 810 F. Supp. 2d at 1276.  The Court concluded that "[t]hese

circumstances are sufficient to form 'a reasonable ground for belief of [defendant's] guilt,' for the

California crime of unlawful sexual intercourse."  United States v. Christy, 810 F. Supp. 2d at

1277 (quoting Maryland v. Pringle, 540 U.S. at 371).  The Tenth Circuit later affirmed the Court's

decision, and it stated:

> The district court found that [the officer] knew that K.Y. was a minor, there
> was a large age difference between her and [the defendant], the two exchanged
> sexually explicit pictures, and that [the defendant] traveled across state lines with
> K.Y. . . . .  Based on [the officer's] knowledge, [the officer's] belief that K.Y. was
> at risk for sexual victimization and assault was reasonable.  Thus, [the officer] had
> reasonable grounds to believe that [the defendant] engaged in sexual activity in
> violation of California law and coerced or enticed K.Y. to travel across state lines
> to engage in criminal sexual activity in violation of federal law.  The district court
> was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted).

The APD officers did not see the firearm in Alderete's vehicle until Carter inspected the

VIN on the doorjamb.  At the time of the VIN inspection, Alderete had just stepped out of his

vehicle, and the APD officers had confirmed his identity.  See FOFs ¶¶ 18-19, at 7.  Alderete was

the APD officers' primary suspect for alleged assault with a firearm based on his vehicle's make

and color matching the 911 caller's description, compare FOF ¶ 2, at 4, with FOF ¶ 7, at 5, but

Alderete's shirt color and lack of visible tattoos did not match the 911 caller's description, compare

FOF ¶ 3, at 5, with FOF ¶ 20, at 7.  The APD officers had also observed in plain view two cellular

telephones in the front passenger seat and two cellular telephones on the Alderete's lap when they

approached Alderete's vehicle.  See FOF ¶ 16, at 7.  The APD officers had not yet searched

Alderete incident to his arrest, which is when they discovered the bullet, $1,485.00 in cash, and

suspected narcotics in Alderete's pockets.  See FOF ¶¶ 22, 44-45, at 7, 10.

Based on the APD officers' knowledge at the time of the VIN inspection, the Court

concludes that, if the VIN inspection was unlawful, the APD officers did not have probable cause

to open Alderete's car door and inspect the vehicle.  The United States conceded that it at most

had reasonable suspicion, and not probable cause, to arrest Alderete for the assault charge.  See

Tr. at 65:11-66:2 (Court, Outler).  The APD officers only had probable cause to arrest Alderete for the outstanding misdemeanor warrant after one of the APD officers determined that Alderete was the vehicle's registered owner based on the temporary tag and Alderete identified himself, and that Alderete had an outstanding warrant for his arrest.  See Tr. at 66:6-24 (Outler, Court).  At best, based on the four cellular telephones, the APD officers had a reasonable suspicion that Alderete's vehicle contained contraband, which is an insufficient basis for applying the inevitable-discovery exception.  See United States v. Souza, 223 F.3d at 1204; Tr. at 56:24-57:2 (Court); id. at 65:11 66:2 (Court, Outler); id. at 66:25-6 (Court).[13]

The third factor weighs in the United States' favor.  The APD officers obtained a search warrant, although the search warrant issued after the VIN inspection and was partly based on the APD officers seeing the firearm inside Alderete's vehicle.  See Incident Report at 3; Roman Aff. at 2.  Thus, "a warrant ultimately was obtained, albeit after the illegal entry."  United States v. Souza, 223 F.3d at 1204.  Although portions of the Roman Aff. are based on information obtained incident to the VIN inspection, the Roman Aff. also contains information about: (i) the four cellular telephones that the APD officers lawfully observed in plain view inside Alderete's vehicle; (ii) the outstanding warrant for Alderete's arrest; and (iii) the bullet that the APD officers discovered in Alderete's pocket while conducting a search incident to his arrest.  See Roman Aff. at 2.  The Roman Aff. also notes that Alderete has prior felony convictions.  See Roman Aff. at 2.  The Court

---

[13]Furthermore, the Court holds that the automobile exception to the warrant requirement does not apply in this case.  Under the automobile exception -- which the United States does not argue as a basis for opening Alderete's driver's seat door -- "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so."  Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018)(emphasis added).  Because the Court concludes that probable cause did not exist for searching Alderete's vehicle, the automobile exception is inapplicable.

concludes that, even if the APD officers had not inspected Alderete's VIN and seen the firearm, by the time the search warrant issued, the APD officers had enough information to develop probable cause that Alderete's vehicle contained contraband. Importantly, as discussed above, at the time of the VIN inspection, the APD officers at best had a reasonable suspicion that Alderete's vehicle may have contained contraband. The Court concludes that it was not until after the APD officers conducted a search incident to Alderete's arrest -- which is when they discovered a bullet, $1,485.00 in cash, and suspected narcotics -- that the APD officers had probable cause. The search incident to Alderete's arrest, however, occurred after the VIN inspection and firearm discovery. See FOF ¶ 26, at 8.

Last, the fourth United States v. Souza factor -- the existence of "evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli" -- leans slightly against applying the inevitable-discovery exception. United States v. Souza, 223 F.3d at 1204 (internal quotation marks and citation omitted). In United States v. Christy, the Court determined that this factor weighs against the defendant where the "record indicates that the search occurred when it did because the deputies believed that they had exigent circumstances to enter [the defendant's] residence." United States v. Christy, 810 F. Supp. 2d at 1279 (quoting United States v. Cunningham, 413 F.3d at 1205). Here, in contrast, there is some evidence that the APD officers jumped the gun. The Carter Lapel Video reveals that, after Alderete exited his vehicle, he closed the driver's seat door. See FOF ¶ 18, at 7. After Alderete closed the door, but before Carter inspected the VIN, Theroux, another APD officer, opened the driver's seat door and briefly looked inside the vehicle. See FOF ¶¶ 28-29, at 8; Carter Lapel Video at 20:17-20:20. Theroux did not inspect the VIN and lacked probable cause to investigate the inside of Alderete's vehicle, which suggests that, if Theroux saw the

firearm, then the firearm's discovery may have been a done deal, or "fait accompli," by the time Carter inspected the VIN.  United States v. Souza, 223 F.3d at 1204.  Carter testified, however, that he is unsure whether Theroux saw the firearm and that he did not discuss the firearm with Theroux.  See Tr. at 32:15-21 (Carter).  The only reasons that the APD officers inspected the VIN are that it is routine to check a vehicle's VIN when a vehicle has a temporary tag, see FOF ¶ 32, at 9; Tr. at 13:22-14:6 (Outler, Carter), and that the vehicle was located in a high-crime area known for stolen vehicles, see FOF ¶ 30, at 8; Tr. at 35:24-36:1 (Gagan, Carter).  Carter testified that there were no other signs that the vehicle might be stolen.  See Tr. at 34:24-35:4 (Gagan, Carter). Although Carter did not know what he and the APD officers would do with Alderete's car when he began the VIN inspection, see FOF ¶ 30, at 9, it was possible that they would tow the car because of Alderete's arrest warrant, but it was also possible that they would leave the car in the parking lot, see FOF ¶ 53, at 11; Tr. at 46:1-13 (Outler, Carter).

Based on the chronology of the APD officers' actions and the lack of probable cause that Alderete's vehicle contained contraband at the time of the VIN inspection, the Court concludes that the APD officers likely "jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."  United States v. Souza, 223 F.3d at 1204 (internal quotation marks omitted).  At the time that Theroux opened the driver's seat door and at the time that Carter inspected the VIN, the APD officers had not discovered the bullet, $1,485.00 in cash, and narcotics in Alderete's pockets, which is when probable cause to search Alderete's vehicle beyond the firearm's discovery first arose.  See FOF ¶¶ 41, 45, at 10.  As discussed above, the Court concludes that impounding Alderete's vehicle was unlawful, which further suggests that the APD officers "jumped the gun" by deciding to tow the vehicle without establishing a community-caretaking rationale.  United States v. Souza, 223 F.3d at 1204.

The Court finds, by a preponderance of the evidence, that the <u>United States v. Souza</u> factors counsel against applying the inevitable-discovery exception. Moreover, as a practical matter, the Court does not have a "high level of confidence" that the APD officers would have inevitably discovered the firearms in Alderete's vehicle had Theroux not opened Alderete's door to look inside the vehicle, had Carter not inspected the VIN, and had the APD officers not unlawfully impounded Alderete's vehicle. <u>United States v. Souza</u>, 223 F.3d at 1205. In <u>United States v. Martinez</u>, the Court noted that the Tenth Circuit's analysis in <u>United States v. Owens</u> "suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." <u>United States v. Martinez</u>, 696 F. Supp. 2d at 1244. Although the Court determines that the APD officers likely would have obtained a search warrant based on the four cellular telephones, the bullet, $1,485.00 in cash, and suspected narcotics in Alderete's pockets, obtaining the search warrant does not guarantee that they would discover the firearms. The APD officers obtained a search warrant four days after arresting Alderete, inspecting the VIN, and towing Alderete's vehicle. <u>See</u> FOF ¶ 28, at 9. The United States has not shown by a preponderance of the evidence that, absent the VIN inspection and unlawful impound, a family member or friend of Alderete would not have driven Alderete's vehicle out of the Family Dollar Store parking lot and removed the firearms before execution of the warrant, because the APD officers did not inquire whether alternate means of removal were available. <u>See</u> FOF ¶ 54, at 12. Vehicles, after all, are mobile, and passengers can easily move small items in and out of them. By impounding Alderete's vehicle on the spot, the APD officers ensured that such removal did not happen, all but guaranteeing the firearms' ultimate discovery pursuant to a warrant. The Court must decide, however, whether the firearms "'ultimately or inevitably would have been discovered by <u>lawful</u>

means.'"   United States v. Christy, 739 F.3d at 540 (quoting Nix v. Williams, 467 U.S. at 444)(emphasis added).  The Court thus concludes that, if its determination in Part I that the VIN inspection was constitutional is incorrect, then the inevitable-discovery exception would not cure this constitutional defect, and the firearms should be suppressed.

  **IT IS ORDERED** that the requests in the Defendant's Motion to Suppress Evidence, filed November 5, 2019 (Doc. 21), are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
    United States Attorney
Samuel A. Hurtado
Thomas A. Outler
    Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

        *Attorneys for the Plaintiff*

Mallory Margaret Gagan
    Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

        *Attorney for the Defendant*